# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONSURU O. TIJANI,
          *Petitioner-Appellant,*

          v.

WAYNE K. WILLIS, INTERIM
DIRECTOR, INTERIOR IMMIGRATION
ENFORCEMENT, UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; CARYL THOMPSON, OIC,
          *Respondents-Appellees.*

No. 04-55285

D.C. No.
CV-03-01624-
WQH/JFS

OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted
January 10, 2005—San Francisco, California

Filed December 13, 2005

Before: John T. Noonan, A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Noonan;
Concurrence by Judge Tashima;
Dissent by Judge Callahan

16263

**COUNSEL**

Steven A. Hirsch, San Francisco, California, Lucas Guttentag, Oakland, California, and Judy Rabinovitz, New York, New York, for the petitioner.

Tom Stahl, and Ernest Cordero, Jr., Assistant United States Attorneys, San Diego, California, for the respondents.

**OPINION**

NOONAN, Circuit Judge:

[1] As of today's date, Tijani has been deprived of his liberty by the government for a period of over two years and four months. This deprivation has been inflicted not as the result of any adjudication of crime but as a bureaucratic application of the authority conferred on the Attorney General by 8 U.S.C. § 1226(c). Despite the substantial powers that Congress may exercise in regard to aliens, it is constitutionally doubtful that Congress may authorize imprisonment of this duration for lawfully admitted resident aliens who are subject to removal. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The case is distinct from *Demore v. Kim*, 538 U.S. 510, 513-514 (2003), where the alien conceded deportability.

[2] To avoid deciding the constitutional issue, we interpret the authority conferred by § 1226(c) as applying to expedited

removal of criminal aliens. Two years and four months of process is not expeditious; and the foreseeable process in this court, where the government's brief in Tijani's appeal of the removal has not yet been filed, is a year or more.

**[3]** We remand to the district court with directions to grant the writ unless the government within 60 days of this order provides a hearing to Tijani before an Immigration Judge with the power to grant him bail unless the government establishes that he is a flight risk or will be a danger to the community. *See Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996).

REVERSED and REMANDED.

TASHIMA, Circuit Judge, concurring:

I concur in Judge Noonan's opinion reversing the denial of habeas relief and requiring the Immigration Court to grant Tijani a bail hearing. His opinion, however, barely alludes to the standards that should govern the conduct of such a hearing, or what facts must be established in order to warrant the grant or denial of release, or who has the burden of proving those facts, and by what standard of proof. I write separately because I believe that we have a duty to give more guidance to the agency and to the court below so that they can carry out their respective mandates.

Monsuru Tijani has now been imprisoned by the federal government for almost two and one-half years. His detention is not the result of a criminal conviction; nor is it because he faces imminent removal. The only reason that Tijani is being detained is because the government *may* be able to prove he is subject to removal. Tijani contends that his indefinite detention for such a reason is not constitutionally permissible. Now, instead of deciding the issues squarely presented by this appeal, the majority opinion grants habeas relief, but without

deciding the issues raised on the merits. I join Judge Noonan's majority opinion because, as I explain below, I do not believe that Tijani's indefinite detention is constitutionally permissible; therefore, that he is entitled to release.

## I.

## A.

At the heart of this case lies the Board of Immigration Appeals' ("BIA's") decision in *In re Joseph*, 22 I. & N. Dec. 799 (BIA 1999), a decision that is both contrary to the Constitution and shortsighted as a matter of policy. *Joseph* concerned the proper scope of § 236(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(c), commonly known as the INA's "mandatory detention" provision. Section 236(c) directs the Attorney General to take into custody certain aliens who are facing deportation and prohibits their release under all but the narrowest of circumstances.

As with most statutes, the relatively simple mandate of § 236(c) leaves many questions unanswered, the most important of which is who, exactly, falls under the statute's provisions. The statute states only that mandatory detention applies to an alien who "is deportable by reason of having committed" a number of specified criminal offenses, but does not define those offenses with precision, nor does it define what "is deportable" means. The implementing regulations also do little to help; they provide an alien with the opportunity to establish that he is "not properly included" in the statute's reach, but they say nothing about what, precisely, that alien must show. *See* 8 C.F.R. § 1003.19 (2005).

In *Joseph*, the BIA finally gave a meaningful answer to this question. The BIA concluded that the initial determination by the Bureau of Immigration and Customs Enforcement ("BICE")[1] that an alien fell within the reach of § 236(c) was

---

[1]When *Joseph* was decided the Immigration and Naturalization Service ("INS") was the primary agency in charge of regulating immigration. INS

entitled to a great deal of deference. *Joseph*, 22 I. & N. Dec. at 800. Thus, the BIA held that an alien who wishes to avoid the reach of § 236(c) was required to show that BICE was "substantially unlikely to establish" the charges that rendered the alien subject to mandatory detention. *Id.* at 806.

Tijani was convicted in California of offenses that have never been found by a court or by the BIA to trigger mandatory detention. Nonetheless, BICE determined that his offenses fell within the reach of § 236(c) and held him in mandatory detention. Based upon the *Joseph* standard, both the Immigration Judge ("IJ") and the BIA affirmed BICE's determination. Today, nearly 30 months later, Tijani remains in mandatory detention while courts continue to sort out whether his offenses actually fall within the reach of the mandatory detention statute.

### B.

The BIA's *Joseph* decision was, plainly put, wrong. There can be no doubt that individual liberty is one of the most fundamental rights protected by the Constitution.[2] *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty [the Due Process] Clause protects."). *Joseph*, which was decided prior

---

ceased to exist on March 1, 2003, and most of its functions were transferred to either the Bureau of Border Security or BICE, both units of the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. As is illustrated by this case, although the *Joseph* decision refers to the INS, the BIA has continued to apply it when reviewing detention by BICE.

[2]There can also be no doubt that the Due Process Clause protects immigrants as well as citizens. *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("The Fifth Amendment, as well as the Fourteenth Amendment, protects every [alien] from deprivation of life, liberty or property without due process of law.").

to *Zadvydas*, gives that right little or no weight. Instead, it establishes a system of "detention by default" by placing the burden fully on the alien to prove that he should not be detained. When such a fundamental right is at stake, however, the Supreme Court has insisted on heightened procedural protections to guard against the erroneous deprivation of that right. In particular, the Supreme Court has time and again rejected laws that place on the individual the burden of protecting his or her fundamental rights.

The first of these decisions is *Addington v. Texas*, 441 U.S. 418 (1979), in which the Court vacated the Texas Supreme Court's ruling that a person could be civilly committed based upon a finding of mental illness by a preponderance of the evidence. *Id.* at 432-33. In reaching its conclusion, the Court elaborated upon the "function of a standard of proof, as that concept is embodied in the Due Process Clause." *Id.* at 423. According to the Court, its primary function was to allocate the risk of an erroneous decision among litigants based upon the competing rights and interests involved. *Id.* Thus, in a civil case, because the interests involved are minor and because "society has a minimal concern with the outcome," the litigants share the risk of error roughly equally under the preponderance of the evidence standard. *Id.* In a criminal case, on the other hand, "the interests of the defendant are of such magnitude" that "our society imposes almost the entire risk of error upon itself" by insisting on the beyond a reasonable doubt standard. *Id.* at 423-24.

Based on these principles, the Court held that the Constitution required a showing of mental illness by at least clear and convincing evidence before an individual's liberty could be constrained. *Id.* at 432-33. Noting that it "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," *id.* at 425, the Court found it improper to ask "[t]he individual . . . to share equally with society the risk of error when the possible injury to the individual is significantly

greater than any possible harm to the state," *id.* at 427. Thus, the Court concluded that "due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id.* at 427.

Since *Addington*, the Supreme Court has repeatedly reaffirmed the principle that "due process places a heightened burden of proof on the State in civil proceedings in which the 'individual interests at stake . . . are both particularly important and more substantial than mere loss of money.' " *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 756 (1982)) (internal quotation marks omitted). In *Santosky*, for example, the Court considered a New York law that allowed the state to terminate parental rights upon proof of "permanent neglect" by a preponderance of the evidence. 455 U.S. at 747. Because the statute directly affected the "fundamental liberty interest of natural parents in the care, custody, and management of their child," *id.* at 753, the Court held that it needed to include greater procedural protection than the preponderance of the evidence standard. *Id.* at 769-70.

Again, in *Foucha v. Louisiana*, 504 U.S. 71 (1992), the Court found a statute unconstitutional that placed on civilly committed individuals the burden of proving that they were not a danger to the public before allowing their release. *Id.* at 73, 83. Noting that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the court held that such a system failed adequately to protect the individual's liberty interest. *Id.* at 83 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). Once again, because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause," clear and convincing evidence was needed to civilly commit the individual. *Id.* at 80.

Finally, in *Cooper*, the Court unanimously rejected a state-law presumption that a defendant was competent to stand trial

unless that defendant established his incompetence by clear and convincing evidence. 517 U.S. at 350, 355-56. Stating that "we perceive no sound basis for allocating to the criminal defendant the large share of the risk which accompanies a clear and convincing evidence standard," the Court held that the Oklahoma law violated due process. *Id.* at 366.

As the above cases illustrate, the Supreme Court has consistently adhered to the principle that the risk of erroneous deprivation of a fundamental right may not be placed on the individual. Rather, when a fundamental right, such as individual liberty, is at stake, the government must bear the lion's share of the burden. Indeed, those cases in which the Court has found detention schemes to be permissible have emphasized the procedures available to protect the individual's rights. For example, in *Salerno*, the Supreme Court upheld the Bail Reform Act, which allowed the government to detain an arrestee pending trial upon a showing by the government that "no release conditions 'will reasonably assure . . . the safety of any other person and the community." 481 U.S. at 741 (quoting Bail Reform Act of 1984, 18 U.S.C. § 3142). In upholding the Act, the Court emphasized how narrowly crafted it was, citing the "stringent time limitations" placed on pretrial detention, *id.* at 747, its applicability only to the "most serious of crimes," *id.*, its requirement of proof of dangerousness by clear and convincing evidence, *id.* at 750, and its judicial safeguards, *id.* at 751-52.

Both the blanket application of the *Joseph* standard and the breadth of its reach stand in stark contrast to the narrowly tailored design of the Bail Reform Act. *Cf. Foucha*, 504 U.S. at 81 ("Unlike the sharply focused scheme at issue in *Salerno*, the Louisiana scheme of confinement is not carefully limited."); *Zadvydas*, 533 U.S. at 692 (expressing scepticism about detention where the "sole procedural protections available to the alien are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous").

In light of the above cases, the *Joseph* standard is not just unconstitutional, it is egregiously so. The standard not only places the burden on the defendant to prove that he should not be physically detained, it makes that burden all but insurmountable. Unlike *Addington* and it's progeny, the *Joseph* standard places little to no risk on the broad shoulders of the government.[3]

One need look no further than Tijani's parallel petition for review to find a perfect illustration of the *Joseph* standard's unconstitutional allocation of the burden of proof.[4] Tijani now has a petition for review of the merits of the IJ's removal order pending before this court. The questions his case raises are by no means easy; the IJ took almost seven months to issue his decision; the BIA took just short of an additional 13 months; and, in his petition for review before this court, the government has not contested his motion for a stay of removal

---

[3]The *Joseph* standard's allocation of risk also creates an entirely separate problem. By subjecting immigrants who, like Tijani, raise difficult questions of law in their removal proceedings to detention while those proceedings are being conducted, the *Joseph* standard forces those immigrants to endure precisely what Tijani has endured: detention that lasts for a prolonged period of months or years. Indeed, the vast majority of Tijani's detention — over 22 of the nearly 30 months that have so far elapsed — has occurred while the BIA and this court have considered his appeals. As I explain below, such detention violates the Constitution of its own right. Narrowing the *Joseph* standard so that mandatory detention is applied only to those who are more certain to fall under its provisions would be a sensible means of guarding against such collateral constitutional violations.

[4]Mandatory detention lasts for a relatively brief period in the vast majority of cases in which it is applied. *Demore v. Kim*, 538 U.S. 510, 529 (2003) ("[I]n 85% of the cases in which aliens are detained pursuant to [§ 236(c)], removal proceedings are completed in an average time of 47 days and a median of 30 days."). But Tijani's situation is by no means unique; other federal courts have also considered habeas challenges brought by immigrants who have been detained under § 236(c) for lengthy periods of time. *See, e.g.*, *Ly v. Hansen*, 351 F.3d 263, 265 (6th Cir. 2003) (500 days of detention before release); *Fuller v. Gonzalez*, 2005 WL 818614 at *1 (D. Conn. 2005) (two years of detention before release).

pending review. Yet, based on the blanket application of the all-but-insurmountable *Joseph* standard, Tijani has remained in detention the entire time his case has been pending. Under these circumstances, his detention for nearly 30 months is simply inconsistent with due process of law.

## C.

### 1.

In light of the due process concerns described above, this court should reject the *Joseph* standard. Instead, it should interpret § 236(c) to apply mandatory detention in a more narrow fashion. Only those immigrants who could not raise a "substantial" argument against their removability should be subject to mandatory detention. *See Demore*, 538 U.S. at 578-79 (Breyer, J., dissenting). This interpretation is not only more respectful of the Constitution, it is also more consistent with Congress' chosen language. *Id.* at 578 ("Title 8 U.S.C. § 1226(c) tells the Attorney General to 'take into custody any alien who . . . *is* deportable' (emphasis added), not one who may, or may not, fall into that category.").

The "substantial argument" standard strikes the best balance between an alien's liberty interest and the government's interest in regulating immigration.[5] *See Demore*, 538 U.S. at

---

[5]Clearly the government's interest here is substantial. Congress has "broad power over naturalization and immigration" that allows it to "make[ ] rules that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 521 (quoting *Diaz*, 426 U.S. at 79-80). Pursuant to this power, Congress created mandatory detention to address its concern that too many immigrants were fleeing from their immigration proceedings. *See generally id.* at 518-21. While it is clear that immigrants may be detained under this provision during a relatively brief period for processing and removal, I do not believe that Congress intended, or that it has the power, to impose prolonged detention on an alien simply because the alien may be ultimately deportable. *Cf. Zadvydas*, 533 U.S. at 701 ("We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months.").

578 (Breyer, J., dissenting) (the "substantial question of law or fact" standard "gives considerable weight to any special governmental interest in detention," is "more protective of a detained alien's liberty interest than those currently administered in the INS' *Joseph* hearings," and has "proved workable in practice in the criminal justice system"). It gives the alien's liberty rights adequate respect and ensures that the alien's detention will be relatively brief. At the same time, it provides the government leeway to detain those aliens who lack any incentive to press their legal claims, and are therefore the most likely to abandon those claims and flee.[6]

## 2.

I believe that Tijani easily meets the substantial argument standard, despite the BIA's intervening decision finding him removable.[7] Tijani almost certainly has a winning argument that he is not removable for having committed an aggravated felony.[8] The only evidence the IJ relied upon for reaching a

---

[6]The majority opinion does not reject such a substantial argument standard. Rather, it simply does not reach the question other than tersely to state Tijani should be granted bail "unless the government establishes that he is a flight risk or will be a danger to the community." Slip op. at 16266 (citing *Cooper*, 517 U.S. at 363).

[7]The BIA's December 29, 2004, decision finding Tijani removable did not change Tijani's position in this appeal. Tijani continues to remain in BICE custody, detained without the possibility of release under § 236(c) of the INA. Specifically, he has not yet entered his 90-day removal period under 8 U.S.C. § 1231(a) because this court has stayed his removal pending its review of the BIA's decision. *See* 8 U.S.C. § 1231(a)(1)(B) ("The removal period begins on the latest of the following: . . . (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order").

[8]This circuit applies the test announced in *Taylor v. United States*, 495 U.S. 575 (1990), to determine whether a conviction constitutes a predicate offense for removal under the INA. *See Tokatly v. Ashcroft*, 371 F.3d 613, 620 (9th Cir. 2004). Under *Taylor*, a court first applies a "categorical" analysis, looking to only the fact of conviction and the statutory definition of the offense to determine if the offense amounts to a predicate offense.

contrary conclusion was the abstract of judgment from Tijani's 1999 conviction, showing that Tijani was ordered to pay restitution of almost $28,000. The abstract of judgment does not show, however, that a jury found that Tijani caused this amount of loss, as this circuit's case law requires. *See Taylor*, 495 U.S. at 602; *Tokatly v. Ashcroft*, 371 F.3d at 620. Further, there appears to be no California law requiring that a jury determine the amount of restitution. *Cf.* Cal. Penal Code § 1202.4(f) ("In every case in which a victim has suffered economic loss as a result of the defendant's conduct, *the court* shall require that the defendant make restitution to the victim . . . .") (emphasis added). This easily constitutes a substantial argument that Tijani's conviction under Cal. Penal Code § 532a(1) does not amount to an aggravated felony.

As to the argument that a violation of Cal. Penal Code § 532a(1) constitutes a crime of moral turpitude, Tijani has also raised a substantial argument. For Tijani's conviction to involve moral turpitude, it must involve fraud. *See Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005) ("Crimes of moral turpitude are of basically two types, those involving fraud and those involving grave acts of baseness or depravity."); *Rodriguez-Herrera v. INS*, 52 F.3d 238, 240 (9th Cir. 1995); *Goldeshtein v. INS*, 8 F.3d 645, 647 (9th Cir. 1993). Yet nothing in Cal. Penal Code § 532a(1) requires intent to defraud. Rather, it is perfectly plausible that a person could be convicted under § 532a(1) without any intent to defraud whatsoever. Indeed, the BIA's only precedent on point, which involved a Connecticut statute identical in all material respects to the California statute at issue, reached this conclusion. *See Matter of Kinney*, 10 I. & N. Dec. 548, 549 (BIA

---

*Taylor*, 495 U.S. at 602. If the statutory definition is broader than the predicate offense, a court employs a "modified categorical approach," asking whether the documentation or judicially noticeable facts that the jury was "actually required to find" show that the defendant was convicted of all the elements of the predicate offense. *Id.*; *Tokatly*, 371 F.3d at 620.

1964) ("The intent that the false statement be relied upon is not necessarily an intent to do evil or work fraud because . . . one who intends that there be reliance upon his false statement may nevertheless also intend to pay for the goods his is attempting to obtain.").

This case stands in stark contrast to our recent case of *Carty*, in which we found that willful failure to file California state income taxes was a crime involving moral turpitude. 395 F.3d at 1082, 1085. Unlike Cal. Penal Code § 532a(1), the statute in *Carty* explicitly required a finding of "intent to evade," which the court found to be synonymous with "intent to defraud." *Id.* at 1083, 1085; *see also id.* at 1085 ("[I]ntent to evade has generally been held to require proof of fraud."). In contrast, Cal. Penal Code § 532a(1) contains no such requirement.

Without further briefing, it is difficult to determine conclusively whether a violation of Cal. Penal Code § 532a(1) constitutes a crime of moral turpitude. Indeed, Tijani's arguments may ultimately not be convincing. Nonetheless, a closer look is surely required. Tijani's moral turpitude argument, therefore, easily rises to the level of "substantial."

### D.

Tijani has been detained for the last 30 months in spite of the fact that he can raise substantial arguments against his removal that necessitate a hard look. Such detention without the possibility of release, based on nothing more than the fact that he may someday be removable, is clearly a violation of his due process rights.

### II.

There is also another reason why we should reach the merits of Tijani's contentions. As the Supreme Court has recently held on two occasions, detention incidental to removal must

bear a reasonable relation to its purpose. *See Demore*, 538 U.S. at 527; *Zadvydas*, 533 U.S. at 690. In *Zadvydas*, the Court held that detention raised serious constitutional questions when its goal — preventing flight — was "no longer practically attainable" due to the unlikelihood of the aliens' ultimate removal. *Zadvydas*, 533 U.S. at 690.[9] In *Demore*, on the other hand, the detention was "reasonably related" to the goal of preventing flight both because the alien was unquestionably removable, and thus presented a high flight risk, and the time period was limited, lasting on average for a mere 47 days. *Demore*, 538 U.S. at 527-29.

As noted by Justice Kennedy in concurrence, however, there exists a point at which the length of detention becomes so egregious that it can no longer be said to be "reasonably related" to an alien's removal. *Id.* at 532 (Kennedy, J., concurring) ("[S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified."). The Sixth Circuit has since agreed with this position in *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2004).

Given the record, this court is in a position to address Tijani's argument that the sheer length of his detention violates the Constitution now. The nearly 30 months that Tijani has so far been detained have reached the point of unreasonableness. In absolute terms the length of time is unreasonable

---

[9]The government in *Zadvydas* offered another justification for the continued detention — "protecting the community." *Zadvydas*, 533 U.S. at 691. The Court squarely rejected this as a justification for continued detention, finding that "preventative detention based on dangerousness" is only permissible "when limited to specially dangerous individuals and subject to strong procedural protections." *Id.* at 691-92. If the justification of "protecting the community" was offered in *Demore*, the Court did not discuss it. The detention in that case was justified solely on the basis of preventing flight.

— it is more than eighteen times the average length of detention (five times the average when the alien chooses to appeal), and is five times as long as the six months the Supreme Court suggested would be unreasonable in *Zadvydas*. *See Zadvydas*, 533 U.S. at 701.

Even considering the individual factors of Tijani's case, the amount of time he has been detained remains unreasonable. While it is true that Tijani requested continuances, those occurred early in the process, and have not contributed at all to the year-long delay since the BIA heard his appeal. *See Ly*, 351 F.3d at 272 (delay attributable to immigrant can help justify continued detention); *cf. Demore*, 538 U.S. at 530-31 (immigrant's request for a continuance helped justify the "somewhat longer than average" length of his detention). In addition, the government had every opportunity to avoid Tijani's additional detention by beginning his removal proceedings while he was incarcerated in California. *See Demore*, 538 U.S. at 529-30 & n.13. Thus, there no longer can be any question that Tijani's continued detention is no longer reasonably related to his deportation.

### III.

For the foregoing reasons, it is clear that Tijani is entitled to be released forthwith pending the completion of his removal proceedings.

---

CALLAHAN, Circuit Judge, dissenting:

As I find that the district court properly denied Monsuro Tijani's habeas petition, I dissent from the remand of this case to the district court. I further disagree with the opinion's suggestion that the result of a hearing must be Tijani's release on bail, and with the concurring opinion's argument that Tijani's extended detention is necessarily unconstitutional.

### A.   Background

An appreciation of this case requires a brief review of how Tijani got himself into his present predicament. A native and citizen of Nigeria, Tijani arrived in the United States in 1980 and adjusted his status to legal permanent resident in 1985. Shortly thereafter, Tijani started having trouble with the law. Most recently on June 9, 1999, Tijani was convicted on twelve counts of providing false information on financial documents in violation of California Penal Code § 532a(1).

On April 9, 2003, when Tijani was scheduled to be paroled from state prison, he was charged with being deportable, served with a notice to appear before an Immigration Judge ("IJ"), and transferred into the custody of the U.S. Bureau of Immigration and Customs Enforcement ("BICE"). He was specifically charged with being removable under 8 U.S.C. § 1227(a)(2)(A)(ii), based on his status as an alien convicted of two crimes involving moral turpitude, and under 8 U.S.C. § 1227(a)(2)(A)(iii), based on his status as an alien convicted of an aggravated felony.

The BICE determined that Tijani was subject to mandatory detention pursuant to 8 U.S.C. § 1226(c), and should be held without bond during the removal proceedings. Tijani contested the detention and requested a bond-determination hearing. A hearing was held before an IJ, in accordance with the Board of Immigration Appeals' ("BIA") decision of *In re Joseph* ("*Joseph*"), 22 I. & N. Dec. 799 (BIA 1999) (en banc). The IJ affirmed the BICE's determination, finding both that Tijani was "subject to mandatory custody" and that he "pose[d] a danger to the property of others due to his lengthy criminal record." On June 26, 2003, the BIA affirmed the IJ's decision that Tijani was subject to mandatory detention.

Tijani then filed his habeas petition in the United States District Court for the Southern District of California, arguing, *inter alia*, that he did not pose a danger to the community and

that mandatory detention violated the Due Process Clause of the Fifth Amendment. On January 21, 2004, the district court denied Tijani's petition. It found that mandatory detention was constitutional, citing *Demore v. Kim*, 538 U.S. 510 (2003), and that Tijani was subject to mandatory detention because his particular conviction under California Penal Code § 532a(1) constituted a crime of moral turpitude. Tijani filed a timely notice of appeal to this court.[1]

## B.   The Standard for Mandatory Detention

I agree with the district court that, under *Demore*, mandatory detention pursuant to 8 U.S.C. § 1226(c) is not per se unconstitutional. In *Demore*, the Supreme Court held:

> Detention during removal proceedings is a constitutionally permissible part of that process. See, *e.g., Wong Wing* [*v. United States,*] 163 U.S. [228, 235 (1896)] ("We think it clear that detention, or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens would be valid"); *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). The INS detention of respondent, a criminal alien who has conceded that he is deportable, for the limited period of his removal proceedings, is governed by these cases.

538 U.S. at 531.

Tijani, of course, is concerned with the application of the

---

[1]Meanwhile, Tijani's removal proceedings continued. On November 5, 2003, an IJ ordered Tijani removed from the United States. Tijani appealed to the BIA, which, on December 30, 2004, summarily affirmed the IJ's decision of removal. Tijani has filed a petition for review with this court, which is not before this panel.

statute to him rather than its abstract constitutionality. In particular, Tijani raises constitutional challenges to the scope of mandatory detention under § 236(a) as interpreted in *Joseph*.[2] He argues that mandatory detention should not extend to lawful permanent residents held beyond a brief period of time because there is little likelihood that they will flee or endanger the community. He also contends that principles of procedural due process prohibit the mandatory detention of lawful permanent residents who raise substantial arguments.

Even assuming that the scope of § 236(c) as interpreted by *Joseph* is problematic,[3] it is by no means certain that Tijani is entitled to release. In addition to having been denied relief by an IJ, the BIA, and the district court, Tijani has also been found removable by both an IJ and the BIA. Moreover, contrary to the position taken by Judge Tashima in his concurring opinion, I am not persuaded by Tijani's contentions that he

---

[2]In *Joseph,* the BIA held that "a lawful permanent resident will not be considered 'properly included' in a mandatory detention category when an Immigration Judge or the Board is convinced that the [government] is substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention." 22 I. & N. Dec. at 806.

[3]The Supreme Court's reference to *Joseph* in *Demore* suggests that the BIA's opinion is not clearly unconstitutional. The Court noted:

> This "*Joseph* hearing" is immediately provided to a detainee who claims that he is not covered by § 1226(c). Tr. of Oral Arg. 22. At the hearing, the detainee may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that the INS is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention. See 8 CFR § 3.19(h)(2)(ii) (2002); *Matter of Joseph,* 22 I. & N. Dec. 799, 1999 WL 339053 (BIA 1999). Because respondent conceded that he was deportable because of a conviction that triggers § 1226(c) and thus sought no *Joseph* hearing, we have no occasion to review the adequacy of *Joseph* hearings generally in screening out those who are improperly detained pursuant to § 1226(c).

*Demore,* 510 U.S. at 515 n.3.

did not commit an aggravated felony and that his conviction was not for a crime involving moral turpitude. Thus, even were Tijani to prevail on his claim that § 236(a) is unconstitutional because it requires a showing that the government is unlikely to prevail in the removal proceedings, it is by no means clear that he would be entitled to release under any alternate standard for bail.

## C. Duration of Detention

Tijani further argues that the duration of his detention under 8 U.S.C. § 1226(c) is unconstitutional. The constitutional limit, if any, to the duration of an alien's detention under § 1226, however, was left open by the Supreme Court in *Demore*. In discussing its prior opinion in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Court noted first that in *Zadvydas*, the aliens challenging their detention following final orders of deportation were ones for whom removal was "no longer practically attainable" and therefore detention did not serve the purported immigration purpose. *Demore*, 538 U.S. at 526. The Court further stated:

> *Zadvydas* is materially different from the present case in a second respect as well. While the period of detention at issue in *Zadvydas* was "indefinite" and "potentially permanent," 533 U.S., at 690-691, 121 S.Ct. 2491, the detention here is of a much shorter duration. *Zadvydas* distinguished the statutory provision it was there considering from § 1226 on these very grounds, noting that "post-removal-period detention, *unlike detention pending a determination of removability* . . . , has no obvious termination point." *Id.,* at 697, 121 S.Ct. 2491 (emphasis added). Under § 1226(c), not only does detention have a definite termination point, in the majority of cases it lasts for less than the 90 days we considered presumptively valid in *Zadvydas*.

*Id.* at 528-29. This statement may be read as implying a limit to the duration of detention pending a determination of removability,[4] or as holding that because the removal proceedings are by definition finite, there is no constitutional limit to the duration of detention under 1226(c).[5]

I agree with Judge Noonan that we need not and should not resolve this issue at this time. I would simply hold that when

[4]Justice Kennedy, in his concurring opinion, wrote:

> since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified. *Zadvydas,* 533 U.S., at 684-686, 121 S.Ct. 2491; *id.,* at 721, 121 S.Ct. 2491 (KENNEDY, J., dissenting) ("[A]liens are entitled to be free from detention that is arbitrary or capricious"). Were there to be an unreasonable delay by the [government] in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.

538 U.S. at 532-33. It should be noted that there is little before us to suggest that Tijani's continued detention is not to protect against dangerousness. I note that the IJ in his November 5, 2003 order of removal (affirmed by the BIA on December 30, 2004) stressed that he found Tijani to be a danger to the community.

[5]The reasons for detaining criminal aliens pending removal do not diminish over the duration of their detention. This is reflected in the following comments by the Supreme Court in *Demore*: "Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings[;]" (538 U.S. at 519) "[t]he Vera Institute study strongly supports Congress' concern that, even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight[;]" (*id.* at 520) and "[s]ome studies presented to Congress suggested that detention of criminal aliens during their removal proceedings might be the best way to ensure their successful removal from this country. . . . It was following those Reports that Congress enacted 8 U.S.C. § 1226, requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability." *Id.* at 521.

the district court on January 21, 2004, denied Tijani's habeas petition, he had not shown that the duration of his detention under § 1226 was unconstitutional. Accordingly, I would not remand this matter.

Rather, Tijani would be better advised to seek relief anew before the agency or in the district court where the effects of intervening events and the passage of time could be fully presented and briefed. Among other potentially relevant concerns that might be considered are (a) the impact of the intervening decisions by the IJ and the BIA that Tijani is removable;[6] (b) whether the passage of time or the above decisions give rise to any alternate administrative remedies for Tijani; (c) whether any delays were attributable to Tijani; and (d) whether the delays give rise to an implication that detention no longer serves the purported immigration purposes.

## D.   Conclusion

The troubling nature of this case is underscored by the fact that each member of our panel has written separately. I agree with the district court's denial of Tijani's habeas petition and, accordingly, would not remand the case to the district court. As the panel has remanded this matter, however, I have explained that it is not clear (1) that the detention of an alien pending removal proceedings is necessarily unconstitutional regardless of how long those proceedings take,[7] and (2) that a new hearing pursuant to the panel's decision must result in Tijani's release pending the completion of his removal proceedings.

---

[6]For example, although Judge Tashima disagrees (see footnote 7 of his concurrence), the government in its letter of January 5, 2005 suggested that Tijani's detention may now fall under 8 U.S.C. § 1231(a) in light of the final order of removal.

[7]Different considerations would come into play if there were any evidence that the government was unreasonably prolonging the removal proceedings.