**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

XOCHITL HERNANDEZ, for
themselves and on behalf of a class
of similarly-situated individuals;
CESAR MATIAS, for themselves and
on behalf of a class of similarly-
situated individuals,
*Plaintiffs-Appellees*,

v.

JEFFERSON B. SESSIONS III, Attorney
General; JAMES MCHENRY, Acting
Director, Executive Office for
Immigration Review; ELAINE C.
DUKE, Acting Secretary, Department
of Homeland Security; THOMAS D.
HOMAN, Acting Director,
Immigration and Customs
Enforcement (ICE); DAVID
JENNINGS, Los Angeles Field Office
Director of ICE; JAMES JANECKA,
Warden, Adelanto Detention
Facility; CHRISTINA HOLLAND, Jail
Administrator, Santa Ana City Jail;
CARLOS ROJA, Chief, Santa Ana City
Department; JON BRIGGS, Captain,
Orange County Sheriff's
Department; MIKE KREUGER,
Captain, Orange County Sheriff's

No. 16-56829

D.C. No.
5:16-cv-00620-
JGB-KK

OPINION

Department; SANDRA HUTCHENS,
Sheriff, Orange County,
          *Defendants-Appellants*.

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted July 11, 2017
Pasadena, California

Filed October 2, 2017

Before:  Stephen Reinhardt, Ferdinand F. Fernandez,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by
Judge Fernandez

# SUMMARY[*]

## Immigration

The panel affirmed the district court's order granting a preliminary injunction in favor of Plaintiffs, a class of non-citizens in removal proceedings who are detained under 8 U.S.C. § 1226(a) in the Central District of California and are unable to afford the bond set by immigration officials.

The panel held that 8 U.S.C. §§ 1226(e) and 1252(a)(2)(B), which restrict judicial review of certain discretionary immigration decisions, did not bar jurisdiction of Plaintiffs' claim that the discretionary process itself is constitutionally flawed. The panel also held that the district court did not err in waiving the prudential requirement that Plaintiffs exhaust their administrative remedies.

The panel held that the district court did not abuse its discretion in granting a preliminary injunction requiring immigration officials when making bond determinations to, inter alia, consider (1) financial ability to obtain bond and (2) alternative conditions of release.

Concurring in part and dissenting in part, Judge Fernandez agreed that the government must consider financial ability and alternative conditions of supervision, a requirement he found to be essentially prohibitory. However, Judge Fernandez dissented as to the breadth of the injunction with respect to its mandatory terms requiring the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

government to conduct new bond hearings within 45 days for those who are currently detained and requiring the government to consult with class counsel to develop and agree to guidelines.

**COUNSEL**

Sherease Rosalyn Pratt (argued), Joseph Hardy, and Adrienne Zack, Trial Attorneys; Colin A. Kisor, Deputy Director; William C. Peachey, Director; Chad A. Readler, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Michael Kaufman (argued) and Ahilan T. Arulanantham, ACLU Foundation of Southern California, Los Angeles, California; Michael Tan and Judy Rabinovitz, ACLU Foundation Immigrants' Rights Project, New York, New York; Stephen B. Kang, ACLU Foundation Immigrants' Rights Project, San Francisco, California; Matthew E. Sloan, Douglas A. Smith, Devon L. Hein, Matthew E. Delgado, Michael D. Hidalgo, and John C. Korevec, Skadden Arps Slate Meagher & Flom LLP, Los Angeles, California; for Plaintiffs-Appellees.

John L. Ewald, Kelly M. Daley, Jasmine M. Owens, and Ned Hirschfeld, Orrick Herrington & Sutcliffe LLP, New York, New York; Linda Klein, American Bar Association, Chicago, Illinois; for Amicus Curiae American Bar Association.

Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Leon T. Kenworthy and Webb Lyons, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; for Amici Curiae Nine Retired

Immigration Judges and Board of Immigration Appeals Members.

Peter R. Afrasiabi and Oscar M. Orozco-Botello, Newport Beach, California; Anne Lai, University of California, Irvine School of Law—Immigrant Rights Clinic, Irvine, California; for Amici Curiae University of California, Irvine School of Law—Immigrant Rights Clinic; Asian Americans Advancing Justice—Los Angeles; Brandeis Human Rights Advocacy Program; Center for Gender & Refugee Studies; Coalition to Abolish Slavery & Trafficking; Columbia Law School Immigrants' Rights Clinic; Community Legal Services in East Palo Alto; Cornell Law School's Asylum and Convention Against Torture Appellate Clinic; Council on American-Islamic Relations; Immigrant Defenders Law Center, Los Angeles; Las Crisantemas; Loyola Immigrant Justice Clinic; National Day Laborer Organizing Network; New York Law School, Safe Passage Project Clinical Class; Northwest Immigrant Rights Project; Public Counsel; Rapid Response Network; Florence Immigrant and Refugee Rights Project; University of California Davis School of Law Immigration Law Clinic; University of California, Irvine School of Law Immigrant Rights Clinic; University of Colorado Criminal/Immigration Defense Clinic; University of Nevada, Las Vegas, Immigration Clinic; and Western State College of Law Immigration Clinic.

Peter H. Kang, Sidley Austin LLP, Palo Alto, California; Sue Wang, Kelly A. Rosencrans, and Alex Baxter, Sidley Austin LLP, San Francisco, California; Jayashri Srikantiah, Immigrants' Rights Clinic, Stanford Law School, Stanford, California; for Amici Curiae National Association of Criminal Defense Lawyers and Center for Legal and Evidence-Based Practices.

## OPINION

REINHARDT, Circuit Judge:

"Courts have confronted, in diverse settings, the age-old problem of providing equal justice for poor and rich, weak and powerful alike."[1] In this case, we reaffirm our commitment to this principle of fairness for all as embodied in the Due Process Clause of the Fifth Amendment. Here, it prohibits our government from discriminating against the poor in providing access to fundamental rights, including the freedom from physical restraints on individual liberty.

Deprivations of physical liberty are a pervasive feature of our current system of immigration enforcement. While the temporary detention of non-citizens may sometimes be justified by concerns about public safety or flight risk, the government's discretion to incarcerate non-citizens is always constrained by the requirements of due process: no person may be imprisoned merely on account of his poverty.[2]

In the present case, the government appeals from the district court's order entering a class-wide preliminary injunction in favor of Plaintiffs, a class of non-citizens in removal proceedings who are detained under 8 U.S.C. § 1226(a) in the Central District of California. The government has already determined that the class members are neither dangerous nor enough of a flight risk to require

---

[1] *M.L.B. v. S.L.J.*, 519 U.S. 102, 110 (1996) (quoting *Griffin v. Illinois*, 351 U.S. 12, 16 (1956)) (quotation marks omitted).

[2] *Bearden v. Georgia*, 461 U.S. 660, 671 (1983).

detention without bond.**[3]** The class members nonetheless remain detained because they are unable to afford bond in the amount set by the immigration officials.

Plaintiffs sought injunctive relief in the district court against the government's policy of failing to require immigration officials to consider financial circumstances and alternative conditions of release at bond hearings. Plaintiffs argued that the policy violated their constitutional and statutory rights under the Due Process Clause of the Fifth Amendment, the Fifth Amendment's equal protection guarantee, the Excessive Bail Clause of the Eighth Amendment, and 8 U.S.C. § 1226(a).**[4]**

The district court granted a preliminary injunction requiring immigration officials when making bond determinations to, *inter alia*, consider (1) financial ability to obtain bond and (2) alternative conditions of release.

---

**[3]** Plaintiffs describe the class as "individuals in removal proceedings whom immigration officials have determined are *not* a danger to the community or a flight risk that requires detention, and therefore have ordered their release on bond." The government responds by pointing out that "[a] bond order merely establishes an alien's *eligibility* for release from detention, *contingent on the non-negotiable condition* that they post a bond to alleviate their higher risk of absconding." There is no actual disagreement between the parties on this point. The fact that ICE or an IJ has determined that a non-citizen is eligible for release on bond shows that he is not so great a flight risk as to require detention without bond. The question then remains: what amount of bond is reasonably likely to ensure the non-citizen's appearance and how should that amount be determined?

**[4]** The § 1226(a) claim is presented exclusively in terms of constitutional avoidance, a doctrine which is inapplicable here. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

Because the district court did not abuse its discretion in granting the injunction, we affirm.

## LEGAL BACKGROUND

Plaintiffs are a class of non-citizens detained pursuant to 8 U.S.C. § 1226(a) on a bond set by a Department of Homeland Security (DHS) or Immigration and Customs Enforcement (ICE)[5] official or an Immigration Judge (IJ) in the Central District of California. Under § 1226(a), the Attorney General has "general, discretionary" authority to detain a non-citizen "pending a decision on whether the alien is to be removed from the United States." *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 948 (9th Cir. 2008) (quoting 8 U.S.C. § 1226(a)). Section 1226(a) also authorizes the Attorney General, in his discretion, to release these non-citizen detainees "on bond of at least $1,500" or "conditional parole." 8 U.S.C. § 1226(a)(2).

When a non-citizen is detained pursuant to § 1226(a), "the DHS district director makes an initial custody determination and may allow the alien's release on bond." *Prieto-Romero v. Clark*, 534 F.3d 1053, 1058 (9th Cir. 2008) (citing 8 C.F.R. § 236.1(d)).[6] "If the alien objects to the director's bond determination, he may request a bond redetermination hearing before an IJ at any time before the issuance of an administratively final order of removal." *Id.* (citing 8 C.F.R. §§ 236.1(d), 1003.19(c)). At this stage, the

---

[5] ICE is a subdivision of DHS.

[6] The record indicates that these determinations are delegated to ICE Deportation Officers who make them based, at least in part, on standardized "Risk Classification Assessments" from which they may require supervisory approval to deviate.

burden is on the non-citizen to "establish to the satisfaction of the Immigration Judge . . . that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight." *In re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006).[7]

If the DHS officer or IJ determines that the non-citizen does not pose a danger and is likely to appear at future proceedings, then he may release the non-citizen on bond or other conditions of release. *See Prieto-Romero*, 534 F.3d at 1058; 8 C.F.R. §§ 236.1(d), 1003.19. If the non-citizen disagrees with the IJ's bond determination or wishes to challenge the amount of bond set by the IJ, he may also

---

[7] The BIA has identified nine nonexclusive factors (the "*Guerra* factors") to consider when determining whether a non-citizen is entitled to release on bond, and if so, the amount of such bond:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*In re Guerra*, 24 I. & N. Dec. at 40.

"appeal the IJ's bond decision to the BIA." *Prieto-Romero*, 534 F.3d at 1058 (citing 8 C.F.R. § 236.1(d)(3)).[8]

At these initial bond determinations, the government currently does not require ICE or IJs to consider a non-citizen's financial circumstances in setting the amount of a bond or whether non-monetary alternative conditions of release would suffice to ensure his future appearance. In fact, according to the declaration of one legal services provider, some IJs refuse to consider a person's financial circumstances, even when these circumstances are raised by

---

[8] Under our precedent, the government may not detain a non-citizen under § 1226(a) for "a prolonged period without providing him a neutral forum in which to contest the necessity of his continued detention." *Casas-Castrillon*, 535 F.3d at 949. Therefore, we have held that the government "must provide periodic bond hearings every six months so that noncitizens may challenge their continued detention as the period of . . . confinement grows." *Rodriguez v. Robbins*, 804 F.3d 1060, 1089 (9th Cir. 2015) (*Rodriguez III*), *cert. granted sub nom. Jennings v. Rodriguez*, 136 S. Ct. 2489 (2016) (internal citation omitted). At these "*Rodriguez* hearings," unlike at the initial bond determination, "the government must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond." *Rodriguez III*, 804 F.3d at 1087.

The Supreme Court granted the government's petition for writ of certiorari in *Rodriguez III*, and on June 26, 2017, the Supreme Court restored *Jennings v. Rodriguez*, No. 15-1204, to the calendar for reargument during the October 2017 term. The primary issue in the Supreme Court's review of *Rodriguez III* is whether the non-citizens are entitled to the recurring hearings at all; by contrast, the parties agree that the initial hearings at issue in this case are required by statute. Moreover, the Supreme Court's review of our holding in *Rodriguez III* that non-citizens are entitled to certain unrelated additional procedural protections during the recurring bond hearings after prolonged detention does not affect our consideration of the lesser constitutional procedural protections sought at the initial bond hearings in this case.

a detainee's counsel. In this case, Plaintiffs sought a preliminary injunction against the government's policy of failing to require DHS and IJs to consider these factors in setting bond.[9]

## FACTUAL BACKGROUND

### A. Plaintiff Hernandez

Xochitl Hernandez was born in Mexico in 1976. She immigrated to the United States in the late 1980s at approximately age 13. She has five children and four grandchildren, all of whom are United States citizens. Before her arrest, Hernandez lived with family members in a rented house in Los Angeles. She avers that her family has few assets or savings.

On February 24, 2016, Hernandez was visiting a friend's house. Los Angeles Police Department (LAPD) and ICE officers, who were apparently searching for a suspected gang member, arrived at the house. Hernandez was detained and

---

[9] Plaintiffs' suit challenges a total of four policies and practices relating to initial custody determinations: (1) "immigration officials are not required to consider an immigration detainee's financial ability to pay when setting a monetary bond"; (2) "when they do set a bond amount, immigration officials require noncitizens to post the full cash bond amount to be released," instead of permitting them to post other assets as collateral; (3) "immigration officials are not required to consider whether alternative conditions of supervision (such as electronic monitoring or periodic reporting requirements), alone or in combination with a lower bond amount, would be sufficient to mitigate flight risk"; and (4) the government does "not recognize a person's financial inability to post bond, despite having made good faith efforts to do so, as a 'changed circumstance' that warrants a new bond hearing." They sought preliminary relief, however, only with respect to (1) consideration of financial circumstances and (3) alternative conditions of release.

taken to an LAPD station, where she was questioned. She was not charged with any crime.

Later that day, Hernandez was transferred to ICE custody, where an officer questioned her about her identity and immigration history. Hernandez declared that the ICE officer did not mention release on bond, nor did he ask her about her financial circumstances or what bond amount she could afford. That same day, DHS served her with a Notice to Appear, charging her with inadmissibility to the United States under 8 U.S.C. § 1182(a)(6)(A)(i) as an alien present in the United States without admission or parole. An ICE officer determined that Hernandez should be detained without bond at the Adelanto Detention Center, pending her removal proceedings.

About two weeks later, Hernandez appeared *pro se* for a bond hearing in Immigration Court. The IJ did not ask any questions about her financial circumstances during the hearing, and Hernandez did not request that he consider her ability to obtain a bond in assessing the amount to be set.

The IJ then issued a written bond decision ordering Hernandez's release upon payment of a $60,000 bond. He determined that Hernandez was not a danger to the community and that a bond would be sufficient to mitigate any risk of flight. He also conditioned her release on refraining from entering or coming within a quarter-mile of three gang-related addresses and from associating or contacting any member of the La Mirada street gang. Hernandez avers that she and her family could not afford to pay a $60,000 bond.

About a month later, Hernandez, again appearing *pro se*, requested that the IJ reconsider her bond amount. The IJ denied her request for reconsideration because there were no

"changed circumstances." In addition, the IJ remarked that he "did consider ability to pay" in his prior bond determination, but there were "significant issues" in her case that required bond in the amount he had set.

On August 23, 2016, Hernandez appeared, now with counsel, for a bond hearing pursuant to *Rodriguez III* before a different IJ. Hernandez testified that she and her family had limited financial resources and indicated that she could only afford a $1,500 bond at most. She also expressed her willingness to be released under alternative conditions, such as an ankle monitor.

The next week, the IJ ordered Hernandez released from custody upon filing of a $5,000 bond and enrollment in the "Alternatives to Detention" program. The IJ's decision did not discuss Hernandez's ability to obtain a bond in the established amount. Hernandez was subsequently released upon filing a bond and was placed on ankle monitoring.[10]

A few weeks later, the BIA sustained Hernandez's appeal of her first $60,000 bond, vacated the IJ's decision on the ground that the bond was excessive, and remanded for further proceedings. The BIA did not address Hernandez's ability to post bond, despite the fact that she raised that issue on appeal.

---

[10] Hernandez could not afford even the $5,000 bond. She obtained her release because a community organization, the National Day Labor Organizing Network, raised enough money to post her bond.

## B.  Plaintiff Matias

Cesar Matias was born in Honduras on September 9, 1978.**[11]** Matias is a gay man who fled Honduras to escape persecution on account of his sexual orientation. He has resided in Los Angeles since May 2005, when he first entered the United States. Prior to his detention, he worked as a hairstylist and in a clothing factory. He avers that he spent all of his earnings on basic necessities and has no savings or any other significant assets. At some point, he suffered a conviction for possession of a controlled substance and was given a deferred judgment for driving without a license. He was also arrested twice, but not convicted, on prostitution charges.

On March 29, 2012, Matias was taken into ICE custody and was interviewed by an ICE officer at a processing center in downtown Los Angeles. When the ICE officer informed him that he would be detained, Matias asked whether he could be released on bond. The officer responded that he could ask the IJ, without asking Matias any questions about his financial resources or the amount of bond he could afford. That same day, ICE issued a Notice to Appear, initiating removal proceedings against Matias.

Seven months later, Matias appeared for a bond hearing before an IJ. During the hearing, the IJ did not ask any questions about Matias's ability to obtain a bond or his financial circumstances. At the end of the hearing, the IJ set bond at $3,000.

---

**[11]** The government states that Matias's "true identity, including his name and date of birth, citizenship, and nationality, are unknown." Matias has presented false documents and testimony to police, ICE officials, and border officials regarding his name and nationality.

Three months after the bond hearing, Matias requested to be released from detention to retrieve documents that would help his case. The IJ refused to reduce his bond and stated that the bond amount was "pretty generous." The IJ also noted that she could not consider reducing the bond amount absent a formal motion.

Eighteen months after denying that release request, the IJ conducted another bond hearing on Matias's motion. At that hearing, she stated that Matias's bond was "reasonable" and ordered that it remain at $3,000, without inquiring as to Matias's financial circumstances or indicating that she considered alternative conditions of release. When asked by the Immigration Judge if he wanted to appeal, Matias responded: "No. I prefer to be detained."

Sixteen months later, the IJ conducted another bond hearing for Matias. The IJ again did not question Matias about his financial circumstances, and ordered that bond remain at $3,000.[12]

Finally, more than four years after he was first detained, Matias was released from ICE custody when a local community organization, Community Initiatives for Visiting Immigrants in Confinement, raised enough money for him to post his bond.

## PROCEDURAL BACKGROUND

On April 6, 2016, Plaintiffs filed a class action complaint seeking habeas, declaratory, and injunctive relief against the

---

[12] There is no evidence in the record of either Hernandez's or Matias's case that ICE or the IJ considered alternative conditions of release. The government does not contend that ICE or the IJs considered such alternatives.

Attorney General, the Director of the Executive Office for Immigration Review (EOIR), the Secretary of DHS, the Director of ICE, the Director of the Los Angeles Field Office of ICE, the Warden of the Adelanto Detention Facility, the Jail Administrator of Santa Ana City Jail, the Chief of the Santa Ana City Department, two Captains of the Orange County Sheriff's Department, and the Orange County Sheriff. Plaintiffs contended that the government's bond-setting policies and practices violated: (1) the Due Process Clause of the Fifth Amendment; (2) their equal protection rights under the Fifth Amendment; (3) the Excessive Bail Clause of the Eighth Amendment; and (4) 8 U.S.C. § 1226(a).

On April 22, 2016 Plaintiffs filed a Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23, seeking to certify a class encompassing "all individuals who are or will be detained pursuant to 8 U.S.C. § 1226(a) on a bond set by an [ICE] officer or an [IJ] in the Central District of California."

On May 19, Plaintiffs filed a Motion for Preliminary Injunction requiring, *inter alia*, immigration officials to "consider ability to pay when setting a bond amount and release on alternative conditions where appropriate." On June 10, Defendants filed a motion to dismiss for lack of jurisdiction and failure to state a claim. On August 22, the district court held a hearing on these three motions.

The district court denied Defendants' motion to dismiss, granted Plaintiffs' motion for class certification, and granted Plaintiffs' motion for a preliminary injunction. In response to Defendants' motion to dismiss, the district court waived the typical requirement that plaintiffs' exhaust their administrative remedies regarding the challenged bond determinations because: (1) Plaintiff's statutory and

constitutional claims presented purely legal questions that did not require development of an administrative record; (2) waiver of exhaustion would "not encourage future habeas petitioners to bypass the administrative scheme" in light of the "discreteness of the legal questions presented"; and (3) BIA review of Plaintiffs' claims would be futile because the BIA' s position on whether consideration of ability to post bond is required is "already set." The district judge also rejected Defendants' arguments that 8 U.S.C. § 1226(e) and 8 U.S.C. § 1252(a)(2)(B) bar federal courts from exercising jurisdiction over Plaintiffs' claims, holding that federal courts retain habeas jurisdiction over constitutional claims and claims raising questions of law under 28 U.S.C. § 2241. Finally, the district court rejected Defendants' arguments that the named Plaintiffs' lacked standing to seek injunctive relief because they had been released from custody after the action was filed because standing "is assessed as of the time an action was initiated and is unaffected by subsequent developments." The district court also noted that the named plaintiffs could continue seeking relief on behalf of the class even after they were released from custody "because [their] claims are 'transitory in nature and may otherwise evade review.'" *Preap v. Johnson*, 831 F.3d 1193, 1197 n.6 (9th Cir. 2016) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090–91 (9th Cir. 2011)).

Regarding Plaintiffs' motion for a preliminary injunction, the district court concluded that Plaintiffs were likely to succeed on the merits of their challenges under the Due Process Clause, the Fifth Amendment's equal protection guarantee, the Excessive Bail Clause, and 8 U.S.C. § 1226(a). The court found that Plaintiffs were likely to suffer irreparable harm as a result of the deprivation of their constitutional rights and that the balance of equities

and public interest weighed in favor of granting a preliminary injunction. Therefore, it granted Plaintiffs' motion.[13]

Under the terms of the preliminary injunction, ICE and IJs are required to consider, in all future hearings, a detainee's financial circumstances in determining the amount of the bond to be set and to consider whether the person may be released on alternative conditions of supervision. The order further requires that the parties meet and confer in good faith to develop implementation guidelines and instructions for ICE and IJs, that the government submit a list of class members to Plaintiffs, and that the government conduct new bond hearings for current class members whose bonds were set before the order went into effect.

Defendants filed a notice of appeal and applied *ex parte* for a stay of all proceedings pending its appeal. After the district court denied the stay, the government renewed its application before this court, which granted it.[14]

## STANDARD OF REVIEW

"We review the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam) (citations omitted). "Our review is limited and deferential." *Id.* The district court

---

[13] The district court also granted Plaintiffs' Motion for Class Certification, which is not at issue in this appeal.

[14] We issued an order shortly before oral argument clarifying that the stay applied only to the preliminary injunction, rather than to "all district court proceedings."

abuses its discretion when it makes an error of law. *Id.* "We review the district court's legal conclusions *de novo*, the factual findings underlying its decision for clear error." *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015) (citation omitted).

## DISCUSSION

### I.

We first address whether jurisdiction over Plaintiffs' claims is proper. The government contends that the we lack jurisdiction for two reasons: (1) 8 U.S.C. §§ 1226(e) and 1252(a)(2)(B) bar federal court jurisdiction over the claims, and (2) the named Plaintiffs failed to exhaust their administrative remedies before pursuing relief in federal court. The government is wrong on both counts.

First, 8 U.S.C. §§ 1226(e) and 1252(a)(2)(B) do not bar jurisdiction over Plaintiffs' claims. Section 1226(e) provides that:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

In other words, custody determinations within the discretion of the Attorney General are not subject to judicial review. Thus, we have held that § 1226(e) precludes jurisdiction over claims that an IJ, exercising his statutorily-delegated discretion, "set an excessively high bond amount." *Prieto-*

*Romero*, 534 F.3d at 1067. That provision does not, however, preclude "habeas jurisdiction over constitutional claims or questions of law." *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011) (quoting *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011)). "[C]laims that the discretionary [bond] process itself was constitutionally flawed are cognizable in federal court on habeas because they fit comfortably within the scope of § 2241." *Singh*, 638 F.3d at 1202 (citations omitted).

Similarly, 8 U.S.C. § 1252(a)(2)(B)(ii) restricts judicial review of the Executive branch's discretionary decisions:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security *the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security*, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added). "Like § 1226(e), § 1252(a)(2)(B)(ii) restricts jurisdiction *only* with respect to the executive's exercise of discretion. It does not limit habeas jurisdiction over questions of law." *Singh*, 638 F.3d at 1202 (emphasis added). Habeas jurisdiction over

such legal and constitutional claims is proper only if they are "colorable," i.e., "the claim must have some possible validity." *Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1271 (9th Cir. 2001) (quotation marks omitted). "[A] petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an abuse of discretion argument in constitutional garb." *Id.*

The government's contention that Plaintiffs have attempted to create jurisdiction over a challenge to discretionary bond determinations "through the pretext of constitutional claims" mischaracterizes Plaintiffs' challenge. They do not challenge the *amount* of their initial bonds as "excessive[]", *cf. Prieto-Romero*, 534 F.3d at 1067; instead, like the petitioner in *Singh*, who challenged, *inter alia*, the constitutionality of the standard of proof applied in his *Casas* hearing, 638 F.3d at 1203, Plaintiffs in the present case claim that the "discretionary process itself was constitutionally flawed" at their initial bond determinations. *Id.* at 1202. Thus their claims are "cognizable in federal court on habeas," *id.*, despite the jurisdictional restrictions in §§ 1226(e) and 1252(a)(2)(B).

Second, the district court did not err in waiving the requirement that plaintiffs exhaust their administrative remedies before pursuing their claims in federal court. The exhaustion requirement is prudential, rather than jurisdictional, for habeas claims. *Singh*, 638 F.3d at 1203 n.3 (citing *Arango Marquez v. I.N.S.*, 346 F.3d 892, 897 (9th Cir. 2003)). We may require prudential exhaustion when:

> (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the

> administrative          scheme;          and
> (3) administrative review is likely to allow
> the agency to correct its own mistakes and to
> preclude the need for judicial review.

*Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (citations omitted). If a petitioner fails to exhaust prudentially required administrative remedies, then "a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies." *Leonardo*, 646 F.3d at 1160. Nonetheless, even if the three *Puga* factors weigh in favor of prudential exhaustion, a court may waive the prudential exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (citation and quotation marks omitted).

Here, after considering the *Puga* factors, the district court correctly decided to waive the prudential exhaustion requirement. First, an administrative appellate record is not necessary to resolve the purely legal questions presented by Plaintiffs' challenge to the government's policy of refusing to require ICE and IJs to consider financial circumstances and alternative conditions of release in bond determinations. *Cf. Singh*, 638 F.3d at 1203 n.3 (holding administrative record was not necessary to decide petitioner's challenge to the constitutionality of procedures at *Casas* hearings).

Second, waiver of the prudential exhaustion requirement will not "encourage the deliberate bypass of the administrative scheme" in future cases, because, once the questions presented here are decided, they "should cease to

arise." *Id*. Any risk of deliberate bypass of administrative procedures is further reduced by the fact that district courts will only have jurisdiction in the "rare case[s]" where future plaintiffs allege a "colorable" constitutional or legal challenge to the government's procedures. *Torres-Aguilar*, 246 F.3d at 1271; *cf. El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 747 (9th Cir. 1991).

Third, we must consider whether "administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003) (citation and quotation marks omitted). Regarding this third factor, however, "where the agency's position on the question at issue appears already set, and it is 'very likely' what the result of recourse to administrative remedies would be, such recourse would be futile and is not required." *El Rescate*, 959 F.2d at 747 (citation omitted). In the present case, the government has implicitly conceded that the BIA's position on the question at issue is already set by acknowledging that, under *Guerra*, "no single factor is mandatory or dispositive." Furthermore, as the district court noted, in several unpublished cases the BIA has concluded that an alien's ability to pay the bond amount is not a relevant bond determination factor. *See, e.g.*, *In re Castillo-Cajura*, 2009 WL 3063742, *1 (B.I.A. Sept. 10, 2009); *In re Serrano-Cordova*, 2009 Immig. Rptr. LEXIS 2444, *2 (B.I.A. June 17, 2009); *In re Sandoval-Gomez*, 2008 WL 5477710, *1 (B.I.A. Dec. 15, 2008); *In re Castillo-Leyva*, 2008 Immig. Rptr. LEXIS 10396, *1 (B.I.A. Sept. 18, 2008).[15] These

---

[15] Plaintiffs filed a redacted copy of another such BIA decision that is not available in the online databases. That decision was an appeal from a bond determination within the Central District of California, and is

unpublished cases, along with *Guerra*'s failure to require consideration of financial circumstances, are sufficient evidence that the BIA's position is set and that exhaustion would be futile.

There are no defects in our jurisdiction over this case.

## II.

We now address whether the district court abused its discretion in granting Plaintiffs' motion for a preliminary injunction. We conclude that it did not.

In order to obtain a preliminary injunction a plaintiff must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under our "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam) (citations omitted).

---

dated April 3, 2017. According to the BIA, "an Immigration Judge is not required to consider an alien's ability to pay when setting a bond." We thus reject the government's contention that the cases cited above do not reflect current policy as well as its speculation that the BIA "may decide to further clarify the *Guerra* standard."

## A.

Plaintiffs are likely to succeed on the merits of their claim under the Due Process Clause.[16] The Due Process Clause of the Fifth Amendment prohibits the Government from depriving individuals of their life, liberty, or property, without due process of law. U.S. Const. amend. V. In particular, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). These protections "appl[y] to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent," and to immigration detention as well as criminal detention. *Id.* at 693.[17]

In the context of immigration detention, it is well-settled that "due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's

---

[16] Although the district court also concluded that Plaintiffs were likely to succeed on the merits of their Fifth Amendment equal protection and Eighth Amendment Excessive Bail Clause claims and granted the injunction on the basis of all three constitutional claims, we ultimately affirm on the basis of the due process claim and therefore express no view as to the equal protection or Eighth Amendment claims.

[17] Although the Supreme Court has described Congress's power over the "policies and rules for exclusion of aliens" as "plenary," *see, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972), and held that this court must generally "defer to Executive and Legislative Branch decisionmaking in that area," *Zadvydas*, 533 U.S. at 695, it is well-established that the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority. *Id.*

constitutionally protected interest in avoiding physical restraint." *Singh*, 638 F.3d at 1203 (quoting *Casas-Castrillon*, 535 F.3d at 950). The government has legitimate interests in protecting the public and in ensuring that non-citizens in removal proceedings appear for hearings, but any detention incidental to removal must "bear[] [a] reasonable relation to [its] purpose." *Zadvydas*, 533 U.S. at 690 (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)); *see also Tijani v. Willis*, 430 F.3d 1241, 1249 (9th Cir. 2005) (Tashima, J., concurring). Detention of an indigent "for inability to post money bail" is impermissible if the individual's "appearance at trial could reasonably be assured by one of the alternate forms of release." *Pugh v. Rainwater*, 572 F.2d 1053, 1058 (5th Cir. 1978) (en banc).

Given that the detainees have been determined to be neither dangerous nor so great a flight risk as to require detention without bond, the question before us is: Is consideration of the detainees' financial circumstances, as well as of possible alternative release conditions, necessary to ensure that the conditions of their release will be reasonably related to the governmental interest in ensuring their appearance at future hearings?[18] We conclude that the answer is yes.

A bond determination process that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate

---

[18] By definition, an ICE officer or an IJ has already determined that the class members are not a danger to the community or so great a flight risk that no bond would secure their appearance; otherwise, they would simply be ineligible for release on bond and thus not a member of the class. *See In re Guerra*, 24 I. & N. Dec. at 38.

interests. Since the government's purpose in conditioning release on the posting of a bond in a certain amount is to "provide enough incentive" for released detainees to appear in the future, we cannot understand why it would ever refuse to consider financial circumstances: the amount of bond that is reasonably likely to secure the appearance of an indigent person obviously differs from the amount that is reasonably likely to secure a wealthy person's appearance.[19] Nor can we understand why the government would refuse to consider alternatives to monetary bonds that would also serve the same interest the bond requirement purportedly advances. This is especially true in light of the empirically demonstrated effectiveness of such conditions at meeting the government's interest in ensuring future appearances. As the American Bar Association explains in its amicus brief, the Intensive Supervision Appearance Program—which relies on various alternative release conditions—resulted in a 99% attendance rate at all EOIR hearings and a 95% attendance rate at final hearings.

Setting a bond amount without considering financial circumstances or alternative conditions of release undermines the connection between the bond and the legitimate purpose of ensuring the non-citizen's presence at future hearings. There is simply no way for the government

---

[19] The government's briefs mischaracterize the relief sought by Plaintiffs. Plaintiffs are not challenging the *amount* of their bonds, but instead contend that they are unconstitutionally detained without adequate procedures for setting bond unless ability to obtain a bond due to financial circumstances and the availability of alternative conditions of release are considered. The parties agree that due process requires only that "a bond . . . be reasonably calculated to assure an alien's appearance at a future removal hearing," but the government fails to explain how such a reasonable calculation can be made on a "case-by-case basis" if financial circumstances and alternative conditions are not considered.

to know whether a lower bond or an alternative condition would adequately serve those purposes when it fails to consider those matters. Therefore, the government's current policies fail to provide "adequate procedural protections" to ensure that detention of the class members is reasonably related to a legitimate governmental interest.

Our conclusion that due process likely requires consideration of financial circumstances and alternative conditions of release is reinforced by cases interpreting the dictates of due process in the criminal context. These cases confirm the common-sense proposition that when the government detains someone based on his or her failure to satisfy a financial obligation, the government cannot reasonably determine if the detention is advancing its purported governmental purpose unless it first considers the individual's financial circumstances and alternative ways of accomplishing its purpose.

In *Bearden v. Georgia*, 461 U.S. 660 (1983), the Supreme Court held that it violates due process for a state to revoke an individual's probation due to a failure to pay a fine or restitution without first considering the reasons for the failure to pay (including the probationer's financial circumstances) and "alternatives to imprisonment" that might serve the state's "interest in punishment and deterrence." *Id.* at 672. By not considering those factors, states impermissibly risk imprisoning individuals "simply because, through no fault of [their] own, [they] cannot pay the fine." *Id.* at 672–73.[20] Such imprisonment would not

---

[20] In *Bearden*, it was especially clear that the State's revocation of probation was not sufficiently tailored to its legitimate interests in light of the fact that the decision to place the defendant on probation in the first place "reflect[ed] a determination by the sentencing court that the

advance any legitimate governmental interest. *See also Turner v. Rogers*, 564 U.S. 431, 447–48 (2011) (noting that a state must demonstrate that an individual has the ability to pay child support before imprisoning him for civil contempt for failure to pay).

We have applied *Bearden* to hold that district judges must consider a defendant's financial circumstances before applying a Guidelines enhancement based on a failure to pay outstanding fines and fees in a prior case. *See United States v. Parks*, 89 F.3d 570, 572 (9th Cir. 1996). As in *Bearden*, we reasoned that consideration of the defendant's financial circumstances was necessary to ensure that the increased sentence served legitimate penological purposes rather than simply being "due to poverty." *Id.* Likewise, in *Pugh*, the Fifth Circuit recognized that consideration of financial circumstances and alternatives to monetary bonds is necessary in order to set release conditions that advance legitimate governmental interests. *See Pugh*, 572 F.2d at 1057.

In this case, the government has no way of determining whether detention of individuals who do not post a bond in the assessed amount is sufficiently related to achieving the government's purpose, unless it first considers their "financial resources" and whether "adequate alternative methods" of satisfying the government's interests are available. *Cf. Bearden*, 461 U.S. at 669, 671. By maintaining

---

State's penological interests do not require imprisonment." *Bearden*, 461 U.S. at 670. Similarly, in the immigration detention context before us in this case, an IJ or ICE officer has already determined that the government's legitimate interests in promoting safety and ensuring future appearance do not require detention without bond.

a process for establishing the amount of a bond that likewise fails to consider the individual's financial ability to obtain a bond in the amount assessed or to consider alternative conditions of release, the government risks detention that accomplishes "little more than punishing a person for his poverty." *Id.*[21]

In sum, as the district court correctly explained, these cases "stand for the general proposition that when a person's freedom from governmental detention is conditioned on payment of a monetary sum, courts must consider the person's financial situation and alternative conditions of release when calculating what the person must pay to satisfy a particular state interest." Otherwise, the government has no way of knowing if the detention that results from failing to post a bond in the required amount is reasonably related to achieving that interest.

The government claims that cases "involv[ing] criminal detention" are irrelevant to immigration detention. On the

---

[21] The government's attempt to distinguish *Bearden* is unpersuasive. It argues that immigration detainees are placed into custody "*solely* due to their alleged violations of immigration law, and *wholly unrelated* to their financial status," whereas the probationer in *Bearden* was "affirmatively punished by incarceration for [his] failure to pay" a fine or restitution. This argument ignores the fact that Plaintiffs would be released from custody if their financial status were different—that is, if they had enough money to post the required bond. As in *Bearden*, the government claims that detention in the absence of the monetary payment serves a particular interest (prevention of flight on the one hand, punishment on the other) but has failed to consider the factors—financial circumstance and alternatives to detention—that must be evaluated in order to determine if detention is sufficiently related to advancing that interest. It is the failure to consider factors so central to the purported interest that results in detention without adequate procedural protections and hence violates due process.

contrary, the Supreme Court has recognized that criminal detention cases provide useful guidance in determining what process is due non-citizens in immigration detention. *See, e.g.*, *Zadvydas*, 533 U.S. at 690–91. Furthermore, in *M.L.B. v. S.L.J.*, the Supreme Court explicitly rejected a call to limit the effect of these principles "to cases typed 'criminal.'" 519 U.S. 102, 127 (1996). Immigration cases, like the parental status termination cases at issue in *M.L.B.*, are set "apart from mine run civil actions" and "involve the awesome authority of the State" to take a "devastatingly adverse action"—here, the power to remove individuals from their homes, separate them from their families, and deport them to countries they may have last seen many years ago. *Compare M.L.B.*, 519 U.S. at 125, 127–28, *with Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe 'penalty' . . . . Although removal proceedings are civil in nature, deportation is nevertheless intimately related to the criminal process.") (citation omitted).

The appropriateness of the requirement that ICE and IJs consider financial circumstances and alternative conditions of release is confirmed by the balance of factors under *Mathews v. Eldridge*:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and

> the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976). The government's refusal to require consideration of financial circumstances is impermissible under the *Mathews* test because the minimal costs to the government of such a requirement are greatly outweighed by the likely reduction it will effect in unnecessary deprivations of individuals' physical liberty.

As to the first factor, the private interest at issue here is "fundamental": freedom from imprisonment is at the "core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). That is beyond dispute.

As to the second factor, when the government determines what bond to set without considering a detainee's financial circumstances, or the availability of alternative conditions of release, there is a significant risk that the individual will be needlessly deprived of the fundamental right to liberty. Even though consideration of these matters does not *guarantee* that a non-citizen will actually be released on a bond that he is financially able to obtain once all flight risk factors are considered, IJs and ICE will certainly be less likely to impose an excessive bond if they are mandated to at least *consider* financial circumstances and alternative conditions before setting the amount.

As to the third factor, the government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions. *See Pugh*, 572 F.2d at 1057 ("Since the function of bail is limited, the fixing of bail for any individual defendant must be based

upon standards relevant to the purpose of assuring the presence of that defendant.") (quotation marks omitted). Therefore, administrative cost is the only factor weighing against requiring consideration of financial circumstances and potential alternative conditions of release. However, the requirement imposes almost no such costs. According to the government, consideration of financial circumstances is already "implicitly" required (although it is not mentioned among the *Guerra* factors), and the IJ Benchbook[22] likewise suggests that financial circumstances should be considered as a non-dispositive factor in bond determinations.[23] All that the preliminary injunction requires of the government is that it make consideration of financial circumstances and alternative conditions of release explicitly, rather than implicitly, required factors. This minimal burden is easily outweighed by the reduction in the risk of erroneous deprivation of liberty that would result from the additional safeguard imposed by the preliminary injunction.

The *Mathews* balancing thus confirms the principle found in *Bearden* and *Parks*: If the government is setting monetary bonds to ensure appearance at future proceedings, there is no legitimate reason for it not to consider the

---

[22] The IJ Benchbook lists ability to pay as a factor to consider in bond determinations, but this resource is not a binding statement of law, nor does it purport to *require* consideration of ability to pay, even if it allows, or even suggests, consideration of that factor.

[23] Without addressing these claims relating to its current procedures, or providing any substantive explanation, the government asserts mandatory consideration of financial circumstances would transform bond hearings into "mini trials" on detainees' finances. In the absence of any evidence supporting these hyperbolic claims, we conclude that any minimal costs that will be imposed on the government by the injunction are far outweighed by the substantial benefits such consideration would afford.

individual's financial circumstances and alternative conditions of release. By failing to require such consideration, the government has created a system of immigration bond determinations that does not adequately provide a reasonable connection between detention and legitimate governmental interests. *See Zadvydas*, 533 U.S. at 690; *Singh*, 638 F.3d at 1203. Plaintiffs are therefore likely to succeed on the merits of their due process claim.

## B.

In addition to a likelihood of success on the merits, "[a] plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Here, Plaintiffs have established a likelihood of irreparable harm by virtue of the fact that they are likely to be unconstitutionally detained for an indeterminate period of time.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, it follows inexorably from our conclusion that the government's current policies are likely unconstitutional— and thus that members of the plaintiff class will likely be deprived of their physical liberty unconstitutionally in the absence of the injunction—that Plaintiffs have also carried their burden as to irreparable harm.

The briefs of amici curiae highlight in more concrete terms the irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment). For example, the American Bar Association describes evidence of subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and

their families as a result of detention, and the collateral harms to children of detainees whose parents are detained. The University of California, Irvine School of Law's Immigrant Rights Clinic relates the story of a detainee who was forced to miss her murdered mother's funeral because she could not afford a $9,000 bond and details the abuse another detainee suffered at the hands of guards and detainees, resulting in mental health problems.[24] In the absence of an injunction, harms such as these will continue to occur needlessly on a daily basis.

## C.

To obtain a preliminary injunction, a plaintiff must also demonstrate that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. The harm to the government in this case is minimal. The government's contention is that the injunction will result in the "diver[sion] [of] the agencies' time, resources, and personnel from other pressing immigration adjudication and enforcement priorities." We reject the government's claim and conclude that the district court did not abuse its discretion in concluding that the balance of equities favors Plaintiffs.

The district court found that the government did "not present any contentions or evidence regarding the 'fiscal and administrative burdens' of considering the ability to pay and alternatives to detention when setting bond." On appeal, the government now relies on the declaration of an ICE Deputy Field Office Director, which avers that the injunction's requirements will "be more time consuming and keep Deportation Officers (DOs) from their other assigned

---

[24] This brief was filed on behalf of "22 law clinics, legal service providers, community groups and immigrant rights organizations."

duties." The conclusory assertions in this declaration, however, are neither persuasive nor supported by any actual evidence.

In fact, contrary to these assertions, the amicus brief of retired IJs and BIA members explains that the district court's injunction imposes only a minor change on the preexisting bond determination process and "certainly [does] not require a 'mini trial' as the Government's opening brief suggests." The injunction merely requires consideration of financial circumstances and alternative conditions of release, which is "not overly complicated or complex." As Plaintiffs point out, the government's position is that ICE and IJs already have discretion to consider these factors; the injunction only requires that they consider this particular factor in every case of non-citizens who have been determined not to present a danger to the community and not to present so great a flight risk as to require detention without bond.

We have no doubt that the district court was correct that any additional administrative costs to the government are far outweighed by the considerable harm to Plaintiffs' constitutional rights in the absence of the injunction. The injunction will likely prevent the unnecessary detention of non-citizens who the government has determined are neither dangerous nor enough of a flight risk to require detention without bond. "Faced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

The injunction's requirement that ICE and IJs consider financial circumstances and alternative conditions of release along with the factors they already consider imposes a relatively modest burden on the government and helps

reduce "the major hardship posed by needless prolonged detention," and so the balance of equities favors Plaintiffs. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (*Rodriguez II*).

**D.**

When, as here, "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Plaintiffs must demonstrate that the public interest favors granting the injunction "in light of [its] *likely* consequences," i.e., "consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence." *Id*. The public interest benefits from an injunction that ensures that individuals are not deprived of their liberty and held in immigration detention because of bonds established by a likely unconstitutional process.

First, and most important, the injunction serves the interests of the general public by ensuring that the government's initial bond determination procedures comply with the Constitution. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

Second, in addition to the potential hardships facing Plaintiffs in the absence of the injunction, the court "may consider . . . the indirect hardship to their friends and family members." *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008). Without the changes ordered by the district court, bond will likely be set

at amounts that are not reasonably related to the government's interests, which places financial and psychological strain on the families of detainees. As the Immigrant Rights Clinic amicus brief explains, family members of detainees must sometimes "choose between scraping money together to pay a bond or paying for necessities, such as rent, utilities, and food." Unnecessary detention places other burdens on families as well, as illustrated by the case described in the Clinic's brief in which a detainee's children had to receive counseling because of the trauma of their government-compelled separation from their father.

Third, the general public's interest in the efficient allocation of the government's fiscal resources favors granting the injunction. *See Golden Gate Rest. Ass'n*, 512 F.3d at 1125. The costs to the public of immigration detention are "staggering": $158 each day per detainee, amounting to a total daily cost of $6.5 million. Supervised release programs cost much less by comparison: between 17 cents and 17 dollars each day per person As the amicus brief from retired IJs explains, reduced detention costs can free up resources to more effectively process claims in Immigration Court. In light of these considerations, the district court did not err in concluding that the interests of the general public would be served by granting the preliminary injunction.

## III.

The government also challenges the scope of the injunction. These challenges fail.

The government contests the requirements in the injunction that it (1) not conduct future initial bond hearings according to procedures that will likely result in

unconstitutional detention, and (2) provide new bond hearings to individuals who are currently detained on bonds that were set pursuant to those procedures.[25] According to the government, these provisions are "mandatory" rather than "prohibitory"—that is, they go beyond "maintaining the status quo" and preventing further constitutional violations, and hence should not be approved in the absence of a risk of "extreme or very serious damage." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotation marks omitted).

Our approach to preliminary injunctions, with separate standards for prohibitory and mandatory injunctions, is controversial. The Sixth Circuit has explicitly rejected a heightened burden for mandatory injunctions, noting, "[w]e [ ] see little consequential importance to the concept of the status quo, and conclude that the distinction between mandatory and prohibitory injunctive relief is not meaningful. Accordingly, we . . . hold that the traditional preliminary injunctive standard—the balancing of equities—applies to motions for mandatory preliminary injunctive relief as well as motions for prohibitory preliminary injunctive relief." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998). The Seventh Circuit likewise holds that "[w]hether and in what sense the grant of relief would change or preserve some previous state of affairs is neither here nor there. To worry these questions is

---

[25] The partial dissent raises additional concerns about the deadlines set in the district court's order. The government did not challenge the deadlines on appeal, and so they are not before us. If the government believes the deadlines are unreasonable, however, it may ask the district court to reconsider them on remand and we expect that the district court will consider its request in all good faith.

merely to fuzz up the legal standard." *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (Posner, J.).

Scholars have also criticized our approach. One critique concludes that "a heightened preliminary injunction standard in cases involving mandatory orders that upset the status quo has little to recommend it," that "[h]istory points decidedly against this approach," and that "[c]ontinued retention of the hollow inquiry into the nature of an injunction or its effect on the status quo will give rise to additional costs without producing any offsetting benefits." Thomas R. Lee, *Preliminary Injunctions and the Status Quo*, 58 Wash. & Lee L. Rev. 109, 166 (2001). More than half a century ago, the Harvard Law Review criticized the distinction, arguing that "the existence of a formula that is susceptible to either a verbal or a substantive interpretation, and that is not always indicative of the severity of the burden a decree is likely to place upon the defendant and court, should not be accepted without question. It is these burdens, rather than any talismanic phraseology, that should determine the issuance or denial of an injunction." *Developments in the Law—Injunctions—Types of Injunctions*, 78 Harv. L. Rev. 1055, 1063 (1965).

Even other circuits that apply a heightened standard to mandatory injunctions have questioned whether the line between mandatory and prohibitory injunctions is meaningful. The Second Circuit has noted that "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics," and that it has "led to distinctions that are more semantic than substantive." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (quotation marks omitted). A majority of the Tenth Circuit has likewise recognized that "determining

whether an injunction is mandatory as opposed to prohibitory can be vexing," and that cases can involve "important competing status quos." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1006 (10th Cir. 2004) (en banc) (Seymour, J., concurring in part and dissenting in part).[26]

We are nevertheless bound by circuit precedent to discern the line between mandatory and prohibitory injunctions as best we can. We do so recognizing the complexities of the problem, the lack of clear authority as to how the distinction is implemented, and the inherent contradictions underlying the somewhat artificial legal construct that cause so many to question the inquiry we now undertake. Given all that, we find the answer to the challenges raised by the government here remarkably simple.

## A.

As to the government's first challenge—its objection to the requirement that it conduct future initial bond hearings in accordance with constitutional processes—the injunction is prohibitory: it prohibits the government from conducting new bond hearings under procedures that will likely result in unconstitutional detentions. This part of the injunction prevents future constitutional violations, a classic form of prohibitory injunction. *See Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014) (holding that an injunction against enforcement of a likely

---

[26] Judge Seymour's opinion is not designated as the opinion of the court, but it was joined in relevant part by eight of the thirteen judges. Six of those judges would have rejected the heightened standard for mandatory injunctions entirely.

unconstitutional state policy was prohibitory rather than mandatory); *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 728, 732 n.13 (9th Cir. 1999) (holding that an injunction against enforcement of a local ordinance that likely violated federal law was prohibitory rather than mandatory); *see also Melendres*, 695 F.3d at 994–96, 1000, 1002 (affirming a preliminary injunction against an allegedly longstanding practice of detaining individuals based solely on suspicions about immigration status); *McCormack v. Hiedeman*, 694 F.3d 1004, 1009, 1020, 1022 (9th Cir. 2012) (affirming a preliminary injunction barring enforcement against the plaintiff of a longstanding Idaho anti-abortion criminal statute); 42 Am. Jur. 2d *Injunctions* § 5 (2017) ("An injunction is considered prohibitory when the thing complained of results from present and continuing affirmative acts and the injunction merely orders the defendant to refrain from doing those acts.").

## B.

The requirement that the government conduct new bond hearings for individuals detained on account of bonds set pursuant to the enjoined procedure (the procedure which fails to consider financial circumstances or alternative conditions of release), may, however, under certain plausible interpretations be deemed mandatory. On the one hand, it directs the government to affirmatively hold new hearings it would not otherwise have held. On the other hand, it can also be understood as merely prohibiting the government from continuing to detain individuals subject to bond amounts set through unconstitutional procedures. Because the nature of this provision is subject to greater dispute than the first, we assume without deciding that the requirement is mandatory.

Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are permissible when "extreme or very serious damage will result" that is not "capable of compensation in damages," and the merits of the case are not "doubtful." *Marlyn Nutraceuticals*, 571 F.3d at 879 (quotation marks omitted). Those requirements are met here. First unlawful detention certainly constitutes "extreme or very serious" damage, and that damage is not compensable in damages. Second, the merits of this case are not "doubtful" in our opinion—Plaintiffs' likely success follows directly from the Supreme Court's dictate that immigration detention must "bear[] a reasonable relation to [its] purpose." *Zadvydas*, 533 U.S. at 690. That connection between detention for failure to post a bond and legitimate governmental purposes can be made only if there is first a consideration of financial circumstances and alternative ways of serving that purpose. *See Bearden*, 461 U.S. at 672–73.

We also note that the injunction in this case is not the "unprecedented relief" alleged by the government. This is not the first time we have approved of preliminary injunctions that require the government to conduct bond hearings in the immigration context. In fact, we have done so at least three times before. *See Preap v. Johnson*, 831 F.3d 1193, 1198, 1207 (9th Cir. 2016);[27] *Rodriguez II*, 715 F.3d at 1130–31;[28] *Diouf v. Napolitano*, 634 F.3d 1081, 1083–84

---

[27] The government has petitioned for a writ of certiorari in *Preap*, but the petition relates only to the merits of the claim, not the mandatory nature of the injunction. *See generally* Petition for a Writ of Certiorari, *Kelly v. Preap*, No. 16-1363 (U.S. May 11, 2017).

[28] The government did not seek certiorari in *Rodriguez II*. The Supreme Court's pending review of *Rodriguez III* does not relate to the validity or scope of the preliminary injunction.

(9th Cir. 2011). In none of these cases did the government challenge the preliminary injunction on the basis that it was mandatory rather than prohibitory. Although, for that reason, these cases do not necessarily control the result here, they at the least inform our analysis by demonstrating that such preliminary injunctions are standard in cases alleging unconstitutional detention.

The rules governing the relief that may be granted by preliminary injunction are not "hard and fast rules, to be rigidly applied to every case regardless of its peculiar facts," because "[t]he infinite variety of situations in which a court of equity may be called upon for interlocutory injunctive relief requires that the court have considerable discretion in fashioning such relief." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963). Mandatory injunctions are most likely to be appropriate when "the status quo . . . is exactly what will inflict the irreparable injury upon complainant." *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984). This is just such a case. The status quo, in which Plaintiffs had their bonds determined under the old procedure, is what is inflicting the irreparable injury— continued detention subject to those bonds, or perhaps more important, to a constitutionally invalid process. We further note that the remedy imposed by the injunction, even if mandatory in nature, is a mild one—it does not require the government to release any detainees; it merely directs it to conduct a relatively small number of new hearings in which it must consider constitutionally required factors while setting the bond amounts. We conclude, therefore, that the district court did not abuse its discretion in granting the portion of the injunction requiring new bond hearings for

those presently detained as a result of the use of unconstitutional procedures.[29]

## IV.

Plaintiffs are likely to succeed on their challenge under the Due Process Clause to the government's policy of allowing ICE and IJs to set immigration bond amounts without considering the detainees' financial circumstances or alternative conditions of release. The government has failed to offer any convincing reason why these factors should not be considered in bond hearings for non-citizens who are determined not to be a danger to the community and not to be so great a flight risk as to require detention without bond. The irreparable harm to Plaintiffs of detention pursuant to bond amounts determined through a likely unconstitutional process far outweighs the minimal

---

[29] The government also challenges the requirement that it meet and confer with Plaintiffs to develop guidelines for future immigration hearings. According to the government, this requirement gives "Plaintiffs' counsel veto authority over the terms and guidelines to be used in those bond proceedings, [which] violates Congress's delegation of such authority to the Executive." To the contrary, the district court retains authority to resolve any disputes between the parties regarding implementation of the injunction. The requirement that the parties meet and confer is merely an administrative mechanism to reduce unnecessary burdens on the district court's resources. It is an entirely ordinary exercise of the district court's authority to manage cases and to encourage cooperation before parties resort to asking the court to resolve a dispute. *See, e.g.*, C.D. Cal. L.R. 7-3 (requiring parties to confer prior to filing most motions and to file the motion only if the parties are "unable to reach a resolution which eliminates the necessity for a hearing").

administrative burdens to the government of complying with the injunction while this case proceeds.

The district court's order granting the preliminary injunction is **AFFIRMED.**

---

FERNANDEZ, Circuit Judge, concurring in part and dissenting in part:

I agree that the district court did not abuse its discretion when it decided to issue a preliminary injunction requiring the consideration of "financial ability" and "alternative conditions of supervision"[1] in making determinations regarding the release of aliens who have been detained pursuant to 8 U.S.C. § 1226(a). However, I do not agree with the breadth of the injunctive order that was issued. Thus, I respectfully concur in part and dissent in part.

A. Concurrence

While I do generally concur in the merits decision itself (including parts I and II and the portion of the opinion which precedes them), I do so with a caveat and with some exceptions as to language that I consider unnecessary, overbroad, or otherwise problematic.

1. *Caveat*—Throughout the opinion, the language used might be taken to declare that there must be two separate (non-overlapping) steps that a hearing officer must take in

---

[1] To avoid referring to both financial ability and alternative conditions each time, I will hereafter just use the former to include both, unless otherwise stated.

making a bond determination: first, the officer must determine if the alien can be released at all;[2] and second, if the alien meets the first step, the officer's remaining determination must be made based upon the nature of the alien's financial ability only.  To the extent that the opinion could be read that way, it should not be.  Rather, a myriad of factors go into deciding the release question,[3] and all we say here is that financial ability must be part of that mix.  As I see it, the majority opinion merely requires that hearing officers must consider financial ability along with the rest of the farrago of factors that they consider.

   2. *Exceptions*

   a.  I do not join the discussion in the fourth paragraph of part II.A.  For example, while there is a serious danger in a failure to consider financial ability, I do not agree that reasonable decisions are unlikely without it.  Moreover, the effectiveness of various approaches is best decided at trial rather than by accepting claims in an amicus brief.

   b.  I do not join in the discussion in the sixth through tenth paragraphs of part II.A. because I am not convinced that cases prohibiting the criminal punishment of persons who cannot afford to pay judgments of one kind or another are significantly similar to the case at hand.

   c.  I do not fully join the discussion in the fifteenth paragraph of part II.A. because I am not satisfied that consideration of potential alternative conditions of release imposes "almost no [administrative] costs" or that the

---

[2] See for example notes 3 and 18 of the majority opinion.

[3] *See, e.g.*, *In re Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006).

preliminary injunction, as written, will impose a "minimal burden" on the government.

d.  I do not join in the third paragraph of part II.B., or in the conclusion therein.

e.  I do not join the fourth and fifth paragraphs of part II.C. to the extent that they signal an approval of the full scope of the injunctive order which we are reviewing.

f.  I do not join the third and fourth paragraphs of part II.D., which I see as unnecessary and problematic.  For example, I do not think we should be deciding public policy issues based upon how we think the government should spend its money in an area as fraught with controversy as immigration.

B.  Dissent: Scope of the Preliminary Injunction

The preliminary injunction issued here has both prohibitory and mandatory aspects.[4]  In considering the

---

[4] As relevant to this opinion, the order reads as follows:

"**I.  Procedures for ICE Custody Determinations, IJ Custody Redeterminations, and BIA Review**

1.  For all noncitizens detained under 8 U.S.C. § 1226(a) in the Central District of California (the "District") after the date of this Order, U.S. Immigration and Customs Enforcement ("ICE") and the Executive Office of Immigration Review ("EOIR"), when setting, re-determining, and/or reviewing the terms of any person's release, must (a) consider the person's financial ability to pay a bond; (b) not set bond at a greater amount than that needed to ensure the person's appearance; and

(c) consider whether the person may be released on alternative conditions of supervision, alone or in combination with a lower bond amount, that are sufficient to mitigate flight risk.

2. Within seven days of this Order, Defendants will meet and confer with Plaintiffs' counsel ("Class Counsel"), and continue to confer thereafter with Class Counsel in good faith, to develop and agree to the following:

a. guidelines for ICE and the Immigration Judges ("IJs") to apply in determining an individual's financial ability to pay a bond;

b. instructions to all ICE officers who conduct initial custody determinations under Section 1226(a) and to all IJs in the District that inform them of the requirements of this Order (including the guidelines developed in Paragraph 2(a) above); and

c. a notice for all class members currently detained in the District summarizing the requirements of this Order in connection with their upcoming custody redetermination hearings pursuant to this Order.

3. As soon as practicable, but in any event no later than thirty days after this order, Defendants shall:

a. issue the instructions developed in Paragraph 2(b) above (including the guidelines developed in Paragraph 2(a) above) to all ICE officers who conduct initial custody determinations under Section 1226(a) and to all IJs in the District; and

propriety of the injunction, we must bear in mind the fact that mandatory terms**[5]** present more difficulties than prohibitive terms,**[6]** and it is the former that I disagree with in this case.

---

> b.  send the notice developed in Paragraph 2(c) above to all class members currently detained in the District.
>
> 4.  Defendants will notify Class Counsel of the date and location of each new custody redetermination hearing set pursuant to this Order at least seven days in advance of the hearing.
>
> 5.  Within 45 days of this order, the EOIR will provide each class member currently detained in the District with a new custody redetermination hearing where the IJ decides whether the class member should be released on his or her own recognizance or released on a money bond and/or other conditions of supervision.  When setting a class member's terms of release, the IJ must comply with Paragraph 1 of this Order.  Nothing in this Order prevents a class member from seeking a continuance to prepare for his or her hearing.
>
> 6.  Where a class member or the government appeals the IJ's custody redetermination to the Board of Immigration Appeals ("BIA"), the BIA will determine whether the IJ has properly performed the analysis set forth in Paragraph 1, which is required by 8 U.S.C. § 1226(a)."

**[5]** *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) ("A mandatory injunction orders a responsible party to take action." (internal quotation marks omitted)).

**[6]** *See id.* at 878 ("A prohibitory injunction prohibits a party from taking action . . . .").

Even without regard to the form and despite the rulings of the district court and the thrust of the majority opinion, "[a] preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). A mandatory injunction is much more likely to trench on that principle than is a prohibitory injunction. For that reason, we have stated that:

> A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.

*Marlyn Nutraceuticals*, 571 F.3d at 879 (citations and internal quotation marks omitted); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The majority bridles at our wisely adopted distinction, but reluctantly agrees that it must be followed. Still, I fear that its distaste for the distinction, together with its declaration that it is "unlikely" that the outstanding bonds are reasonable, has helped to lead it astray. However, when the above standards are applied, I cannot agree with the district court order which proceeds as if the merits have been finely adjudicated and which immediately and inappropriately imposes mandatory duties upon the government accordingly.

More specifically, I disagree with the district court's order in the ways set forth below.

1.  As to paragraph I.1.[7] of the order, while I agree that the government must consider financial ability in future release hearings,[8] I do not agree that it must forthwith conduct new bond hearings for all those who are currently detained, regardless of the nature of the records regarding their prior hearings.    To the extent this paragraph contemplates that must be done, I do not agree.

2.  I do not agree with the scope of paragraphs I.2. and I.3. of the order.  Again, I do agree that financial ability must be considered at future release hearings, but I do not agree that the district court can, at this point, order the government to consult with class counsel and "develop and agree" to guidelines.    While it is suggested that this is a mere conferencing and consulting direction, it plainly is not just that—it directs the government to "agree" with class counsel.  As I see it, at this point, the government must consider financial ability.   If detailed procedures beyond those that already exist (or amendments to current procedures) are needed for that purpose, the government's determination and adoption of those procedures should basically be through the usual governmental processes[9] rather than in a forced march and a required agreement with class counsel.  I note that all of that is to take place within 30 days of the order.   That by itself is unreasonable.

---

[7] All references to paragraphs in the order are to those as set forth in note 4, *supra*.

[8] *See* 8 U.S.C. § 1226(a).

[9] *See Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987).

Incidentally, I would see no real difficulty if the government were merely required to distribute the preliminary injunction order to the relevant parties (officers and class members) once a proper order is issued. These paragraphs should be set aside or rewritten accordingly.

3. I do not agree with paragraph I.5., which requires that hearings for all current detainees be conducted within 45 days of the order. Specifically I do not agree with the requirement that hearings be held for all current detainees, and the timing exacerbates the problem. Interestingly enough, the government is required to meet, confer, and agree with class counsel and give necessary notices within 30 days. It is then to conduct hearings for all of those currently detained within 15 days thereafter, or, of course, agree earlier and gain some extra hearing time. I would also strike this unreasonable paragraph.

In short, at this preliminary injunction stage of the proceeding, I agree that the government must consider financial ability in future hearings, a requirement that I find to be essentially prohibitory. I do not agree with the other essentially mandatory aspects of the order regarding development and agreement on guidelines, or the holding of hearings for all current detainees forthwith and within the strict deadlines set out by the district court.

Thus, I respectfully concur with the majority opinion in part and dissent in part.