A. Likelihood of Success
"The first factor under Winter is the most important-likely success on the merits." Garcia v. Google, Inc. , 786 F.3d 733, 740 (9th Cir. 2015). While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek. See Univ. of Texas v. Camenisch , 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).
Here, the only claim currently at issue is Plaintiffs' due process claim.[9] Specifically, Plaintiffs contend the Government's practice of separating class members from their children, and failing to reunite those parents who have been separated, without a determination that the parent is unfit or presents a danger to the child violates the parents' substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution. To prevail on this claim, Plaintiffs must show that the Government practice "shocks the conscience." In the Order on Defendants' motion to dismiss, the Court found Plaintiffs had set forth sufficient facts to support that claim. Ms. L. , 302 F.Supp.3d at 1160-67, 2018 WL 2725736, at *7-12. The evidence submitted since that time supports that finding, and demonstrates Plaintiffs are likely to succeed on this claim.
As explained in the Court's Order on Defendants' motion to dismiss, the "shocks the conscience" standard is not subject to a rigid list of established elements. See *1143 County of Sacramento v. Lewis , 523 U.S. 833, 850, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (stating "[r]ules of due process are not ... subject to mechanical application in unfamiliar territory.") On the contrary, "an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements[.]" Armstrong v. Squadrito , 152 F.3d 564, 570 (7th Cir. 1998).
Here, each Plaintiff presents different circumstances, but both were subjected to the same government practice of family separation without a determination that the parent was unfit or presented a danger to the child. Ms. L. was separated from her child without a determination she was unfit or presented a danger to her child, and Ms. C. was not reunited with her child despite the absence of any finding that she was unfit or presented a danger to her child. Outside of the context of this case, namely an international border, Plaintiffs would have a high likelihood of success on a claim premised on such a practice. See D.B. v. Cardall , 826 F.3d 721, 741 (4th Cir. 2016) (citing cases finding due process violation where state action interfered with rights of fit parents); Heartland Academy Community Church v. Waddle , 595 F.3d 798, 808-811 (8th Cir. 2010) (finding removal of children from religious school absent evidence the students were "at immediate risk of child abuse or neglect" was violation of clearly established constitutional right); Brokaw v. Mercer County , 235 F.3d 1000, 1019 (7th Cir. 2000) (citing Croft v. Westmoreland County Children and Youth Services , 103 F.3d 1123, 1126 (3d Cir. 1997) ("courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.")
The context of this case is different. The Executive Branch, which is tasked with enforcement of the country's criminal and immigration laws, is acting within its powers to detain individuals lawfully entering the United States and to apprehend individuals illegally entering the country. However, as the Court explained in its Order on Defendants' motion to dismiss, the right to family integrity still applies here. The context of the family separation practice at issue here, namely an international border, does not render the practice constitutional, nor does it shield the practice from judicial review.
On the contrary, the context and circumstances in which this practice of family separation were being implemented support a finding that Plaintiffs have a likelihood of success on their due process claim. First, although parents and children may lawfully be separated when the parent is placed in criminal custody, the same general rule does not apply when a parent and child present together lawfully at a port of entry seeking asylum. In that situation, the parent has committed no crime, and absent a finding the parent is unfit or presents a danger to the child, it is unclear why separation of Ms. L. or similarly situated class members would be necessary. Here, many of the family separations have been the result of the Executive Branch's zero tolerance policy, but the record also reflects that the practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally. Ms. L. is an example of this family separation practice expanding beyond its lawful reach, and she is not alone. (See, e.g. , Pls.' Reply Br. in Supp. of Mot. for Class Cert., Exs. 22-23, 25-26) (declarations from parents *1144 attesting to separation at border after lawfully presenting at port of entry and requesting asylum); Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶¶ 9, 10b, 11a (listing parents who were separated from children after presenting at ports of entry) ).
As set out in the Court's prior Order, asylum seekers like Ms. L. and many other class members may be fleeing persecution and are entitled to careful consideration by government officials. Particularly so if they have a credible fear of persecution. We are a country of laws, and of compassion. We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum. See, e.g., The Refugee Act, PL 96-212, 94 Stat. 102 (1980). The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster.
Second, the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence. This is a startling reality. The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels-state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as property. Certainly, that cannot satisfy the requirements of due process. See Santosky v. Kramer , 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoting Lassiter v. Dept. of Soc. Services of Durham County, N.C. , 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) ) (stating it is " 'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right.") (internal quotation marks omitted).
The lack of effective methods for communication between parents and children who have been separated has also had a profoundly negative effect on the parents' criminal and immigration proceedings, as well as the childrens' immigration proceedings. See United States v. Dominguez-Portillo , No:EP-17-MJ-4409-MAT, 2018 WL 315759, at *1-2 (W.D. Tex. Jan. 5, 2018) (explaining that criminally charged defendants "had not received any paperwork or information concerning the whereabouts or well-being of" their children). In effect, these parents have been left "in a vacuum, without knowledge of the well-being and location of their children, to say nothing of the immigration proceedings in which those minor children find themselves." Id. at *14. This situation may result in a number of different scenarios, all of which are negative-some profoundly so. For example, "[i]f parent and child are asserting or intending to assert an asylum claim, that child may be navigating those legal waters without the benefit of communication with and assistance from her parent; that defendant, too, must make a decision on his criminal case with total uncertainty about this issue." Id. Furthermore, " a defendant facing certain deportation would be unlikely to know whether he might be deported before, simultaneous *1145 to, or after their child, or whether they would have the opportunity to even discuss their deportations[.]" Id. Indeed, some parents have already been deported without their children, who remain in government facilities in the United States.[10]
The absence of established procedures for dealing with families that have been separated at the border, and the effects of that void on the families involved, is borne out in the cases of Plaintiffs here. Ms. L. was separated from her child when immigration officials claimed they could not verify she was S.S.'s mother, and detained her for expedited removal proceedings. That rendered S.S. "unaccompanied" under the TVPRA and subject to immediate transfer to ORR, which accepted responsibility for S.S. There was no further communication between the agencies, ICE and ORR. The filing of the present lawsuit prompted release and reunification of Ms. L. and her daughter, a process that took close to five months and court involvement. Ms. C. completed her criminal sentence in 25 days, but it took nearly eight months to be reunited with her son. She, too, had to file suit to regain custody of her son from ORR.
These situations confirm what the Government has already stated: it is not affirmatively reuniting parents like Plaintiffs and their fellow class members for purposes other than removal. Outside of deportation, the onus is on the parents, who, for the most part, are themselves in either criminal or immigration proceedings, to contact ORR or otherwise search for their children and make application for reunification under the TVPRA. However, this reunification procedure was not designed to deal with the present circumstances. (See Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 33 ¶¶ 6-9.) Rather, "ORR's reunification process was designed to address the situation of children who come to the border or are apprehended outside the company of a parent or legal guardian." (Id. ¶ 6.) Placing the burden on the parents to find and request reunification with their children under the circumstances presented here is backwards. When children are separated from their parents under these circumstances, the Government has an affirmative obligation to track and promptly reunify these family members.
This practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim. When combined with the manner in which that practice is being implemented, e.g. , the lack of any effective procedures or protocols for notifying the parents about their childrens' whereabouts or ensuring communication between the parents and children, and the use of the children as tools in the parents' criminal and immigration proceedings, (see Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 29 ¶¶ 8, 14), a finding of likelihood of success is assured. A practice of this sort implemented in this way is likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,"
*1146 Lewis , 523 U.S. at 847 n.8, 118 S.Ct. 1708, interferes with rights " 'implicit in the concept of ordered liberty[,]' " Rochin v. Cal. , 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (quoting Palko v. State of Conn. , 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937) ), and is so " 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency." Breithaupt v. Abram , 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).
For all of these reasons, the Court finds there is a likelihood of success on Plaintiffs' due process claim.
B. Irreparable Injury
Turning to the next factor, Plaintiffs must show they are " 'likely to suffer irreparable harm in the absence of preliminary relief.' " Hernandez v. Sessions , 872 F.3d 976, 994 (9th Cir. 2017) (quoting Winter , 555 U.S. at 20, 129 S.Ct. 365 ). " 'It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.' " Id. (quoting Melendres v. Arpaio , 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). As explained, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.
The injury in this case, however, deserves special mention. That injury is the separation of a parent from his or her child, which the Ninth Circuit has repeatedly found constitutes irreparable harm. See Leiva-Perez v. Holder , 640 F.3d 962, 969-70 (9th Cir. 2011) ; Washington v. Trump , 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as an irreparable harm).
Furthermore, the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them. One of those parents, Mr. U., an asylum seeker from Kyrgyzstan, submitted a declaration in this case in which he stated that after he was told he was going to be separated from his son he "felt as though [he] was having a heart attack." (Reply in Supp. of Mot. for Class Cert., Ex. 21 ¶ 4.) Another asylum-seeking parent from El Salvador who was separated from her two sons writes,
The separation from my sons has been incredibly hard, because I have never been away from them before. I do not want my children to think that I abandoned them. [My children] are so attached to me. [One of my children] used to sleep in bed with me every night while [my other child] slept in his own bed in the same room.... It hurts me to think how anxious and distressed they must be without me.
(Reply in Supp. of Mot. for Class Cert., Ex. 24 ¶ 9.) And another asylum-seeking parent from Honduras described having to place her crying 18-month old son in a car seat in a government vehicle, not being able to comfort him, and her crying as the officers "took [her] son away." (Reply in Supp. of Mot. for Class Cert., Ex. 25 ¶ 7.) There has even been a report that one father committed suicide in custody after being separated from his wife and three-year-old child. See Molly Hennessy-Fiske, Honduran Migrant Who Was Separated From Family is Found Dead in Texas Jail in an Apparent Suicide , L.A. TIMES (June 9, 2018, 5:35 PM), http://www.latimes.com/nation/la-na-border-patrol-suicide20180609-story.html.
The parents, however, are not the only ones suffering from the separations. One of the amici in this case, Children's Defense Fund, states,
there is ample evidence that separating children from their mothers or fathers leads to serious, negative consequences to children's health and development. Forced separation disrupts the parent-child relationship and puts children at *1147 increased risk for both physical and mental illness.... And the psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation-even after eventual reunification with a parent or other family.
(ECF No. 17-11 at 3.) Other evidence before the Court reflects that "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." (ECF No. 17-13 at 2.) That evidence reflects:
Separation from family leaves children more vulnerable to exploitation and abuse, no matter what the care setting. In addition, traumatic separation from parents creates toxic stress in children and adolescents that can profoundly impact their development. Strong scientific evidence shows that toxic stress disrupts the development of brain architecture and other organ systems, and increases the risk for stress-related disease and cognitive impairment well into adult years. Studies have shown that children who experience such traumatic events can suffer from symptoms of anxiety and post-traumatic stress disorder, have poorer behavioral and educational outcomes, and experience higher rates of poverty and food insecurity.
(ECF No. 17-13 at 2.) And Martin Guggenheim, the Fiorello LaGuardia Professor of Clinical Law at New York University School of Law and Founding Member of the Center for Family Representation, states:
Children are at risk of suffering great emotional harm when they are removed from their loved ones. And children who have traveled from afar and made their way to this country to seek asylum are especially at risk of suffering irreversible psychological harm when wrested from the custody of the parent or caregiver with whom they traveled to the United States.
(Mem. in Supp. of Classwide Prelim. Inj., Ex. 17 ¶ 16.) All of this evidence, combined with the constitutional violation alleged here, conclusively shows that Plaintiffs and the class members are likely to suffer irreparable injury if a preliminary injunction does not issue.
C. Balance of Equities
Turning to the next factor, "[t]o obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.' " Hernandez , 872 F.3d at 995 (quoting Winter , 555 U.S. at 20, 129 S.Ct. 365 ). As with irreparable injury, when a plaintiff establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." Arizona Dream Act Coalition v. Brewer , 757 F.3d 1053, 1069 (9th Cir. 2014).
Plaintiffs here assert the balance of equities weighs in favor of an injunction in this case. Specifically, Plaintiffs argue Defendants would not suffer any hardship if the preliminary injunction is issued because the Government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" Rodriguez v. Robbins , 715 F.3d 1127, 1145 (9th Cir. 2013) ; see also Arizona Dream Act Coalition , 757 F.3d at 1069 (quoting Melendres v. Arpaio , 695 F.3d 990, 1002 (9th Cir. 2012) ) (stating balance of equities favors " 'prevent[ing] the violation of a party's constitutional rights.' "). When the absence of harm to the Government is weighed against the harms to Plaintiffs set out above, Plaintiffs argue this factor weighs in their favor. The Court agrees.
*1148 The primary harm Defendants assert here is the possibility that an injunction would have a negative impact on their ability to enforce the criminal and immigration laws. However, the injunction here-preventing the separation of parents from their children and ordering the reunification of parents and children that have been separated-would do nothing of the sort. The Government would remain free to enforce its criminal and immigration laws, and to exercise its discretion in matters of release and detention consistent with law. See EO §§ 1, 3(a) & (e) (discussing Flores v. Sessions , CV 85-4544); see also Comm. of Cent. Am. Refugees v. I.N.S., 795 F.2d 1434, 1439-40 (9th Cir. 1986) (stating "prudential considerations preclude[ ] interference with the Attorney General's [exercise of] discretion" in selecting the detention facilities where aliens are to be detained). It would just have to do so in a way that preserves the class members' constitutional rights to family association and integrity. See Rodriguez , 715 F.3d at 1146 ("While ICE is entitled to carry out its duty to enforce the mandates of Congress, it must do so in a manner consistent with our constitutional values.") Thus, this factor also weighs in favor of issuing the injunction.
D. Public Interest
The final factor for consideration is the public interest. See Hernandez , 872 F.3d at 996 (quoting Stormans, Inc. v. Selecky , 586 F.3d 1109, 1139 (9th Cir. 2009) ) ("When, as here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.' ") To obtain the requested relief, "Plaintiffs must demonstrate that the public interest favors granting the injunction 'in light of [its] likely consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.' " Id. (quoting Stormans , 586 F.3d at 1139 ). " 'Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.' " Id. (quoting Preminger v. Principi , 422 F.3d 815, 826 (9th Cir. 2005) ).
This case involves two important public interests: the interest in enforcing the country's criminal and immigration laws and the constitutional liberty interest "of parents in the care, custody, and control of their children[,]" which "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. Troxel v. Granville , 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Both of these interests are valid and important, and both can be served by the issuance of an injunction in this case.
As stated, the public's interest in enforcing the criminal and immigration laws of this country would be unaffected by issuance of the requested injunction. The Executive Branch is free to prosecute illegal border crossers and institute immigration proceedings against aliens, and would remain free to do so if an injunction were issued. Plaintiffs do not seek to enjoin the Executive Branch from carrying out its duties in that regard.
What Plaintiffs do seek by way of the requested injunction is to uphold their rights to family integrity and association while their immigration proceedings are underway. This right, specifically, the relationship between parent and child, is "constitutionally protected," Quilloin v. Walcott , 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), and "well established." Rosenbaum v. Washoe Cty. , 663 F.3d 1071, 1079 (9th Cir. 2011). The public interest in upholding and protecting that right in the circumstances presented here would be served by issuance of the requested injunction.
*1149 See Arizona Dream Act Coalition , 757 F.3d at 1069 (quoting Valle del Sol Inc. v. Whiting , 732 F.3d 1006, 1029 (9th Cir. 2013) (" '[I]t is clear that it would not be equitable or in the public's interest to allow the state ... to violate the requirements of federal law, especially when there are no adequate remedies available.' ") Accordingly, this factor, too, weighs in favor of issuing the injunction.
III.
CONCLUSION
The unfolding events-the zero tolerance policy, EO and DHS Fact Sheet-serve to corroborate Plaintiffs' allegations. The facts set forth before the Court portray reactive governance-responses to address a chaotic circumstance of the Government's own making. They belie measured and ordered governance, which is central to the concept of due process enshrined in our Constitution. This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children. The extraordinary remedy of classwide preliminary injunction is warranted based on the evidence before the Court. For the reasons set out above, the Court hereby GRANTS Plaintiffs' motion for classwide preliminary injunction, and finds and orders as follows:
(1) Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody.[11]
(2) If Defendants choose to release Class Members from DHS custody, Defendants, and their officers, agents, servants, employees and attorneys, and all those who are in active concert or participation with them, are preliminary enjoined from continuing to detain the minor children of the Class Members and must release the minor child to the custody of the Class Member, unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child.
(3) Unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child:
(a) Defendants must reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order; and
(b) Defendants must reunify all Class Members with their minor children age five (5) and over within thirty (30) days of the entry of this Order.
(4) Defendants must immediately take all steps necessary to facilitate regular communication between Class *1150 Members and their children who remain in ORR custody, ORR foster care, or DHS custody. Within ten (10) days, Defendants must provide parents telephonic contact with their children if the parent is not already in contact with his or her child.
(5) Defendants must immediately take all steps necessary to facilitate regular communication between and among all executive agencies responsible for the custody, detention or shelter of Class Members and the custody and care of their children, including at least ICE, CBP, BOP, and ORR, regarding the location and well-being of the Class Members' children.
(6) Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from removing any Class Members without their child, unless the Class Member affirmatively, knowingly, and voluntarily declines to be reunited with the child prior to the Class Member's deportation, or there is a determination that the parent is unfit or presents a danger to the child.
(7) This Court retains jurisdiction to entertain such further proceedings and to enter such further orders as may be necessary or appropriate to implement and enforce the provisions of this Order and Preliminary Injunction.
A status conference will be held on July 6, 2018 , at 12:00 noon , to discuss all necessary matters. A notice of teleconference information sheet will be provided in a separate order.
IT IS SO ORDERED.

In their supplemental brief, Defendants assert Plaintiffs are raising new claims based on events that transpired after the Complaints were filed, e.g. , the announcement of the zero tolerance policy and the EO. The Court disagrees. Plaintiffs' claims are not based on these events, but are based on the practice of separating class members from their children. The subsequent events are relevant to Plaintiffs' claim, but they have not changed the claim itself, which remains focused on the practice of separation.

See , e.g. , Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶ 16k, Ex. 36 ¶ 7a; Nelson Renteria, El Salvador demands U.S. return child taken from deported father , REUTERS (June 21, 2018, 4:03 PM), https://www.reuters.com/article/us-usa-immigration-el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-idUSKBN1JH3ER; Miriam Jordan, 'I Can't Go Without My Son': A Deported Mother's Plea , N.Y. Times (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html.

"Fitness" is an important factor in determining whether to separate parent from child. In the context of this case, and enforcement of criminal and immigration laws at the border, "fitness" could include a class member's mental health, or potential criminal involvement in matters other than "improper entry" under 8 U.S.C. § 1325(a), (see EO § 1), among other matters. Fitness factors ordinarily would be objective and clinical, and would allow for the proper exercise of discretion by government officials.